Tashika SYKES, Relator,

v.

NORTHWEST AIRLINES,
INC., Respondent,

Department of Employment and
Economic Development,
Respondent.

No. A10–88.

Court of Appeals of Minnesota.

Oct. 12, 2010.

Shirley I. Chase, Chase Law PLLC, Minneapolis, Minnesota (for relator).

Northwest Airlines, Inc., St. Louis, Missouri (respondent employer).

Lee B. Nelson, Britt K. Lindsay–Waterman, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department).

Considered and decided by MINGE, Presiding Judge; ROSS, Judge; and BJORKMAN, Judge.

## OPINION

ROSS, Judge.

Relator Tashika Sykes quit her job with Northwest Airlines for a higher-salaried position. But her new job lasted less than two weeks for lack of funding. Sykes applied for but was denied unemployment benefits arising from her employment with Northwest because she had quit that position. She now challenges the decision of the unemployment law judge (ULJ) that she is ineligible for unemployment benefits, arguing that the better-job exception applies. Because Sykes did not quit her employment to accept substantially better employment, we affirm.

## FACTS

Relator Tashika Sykes worked for respondent Northwest Airlines Inc. from April 1978 through March 2009. In January 2009, Northwest offered Sykes and other employees a "voluntary early-out program" through which an employee could quit her employment but continue to receive subsidized health insurance through Northwest. Sykes accepted the offer. When Sykes quit her job with Northwest, her annual salary was approximately $60,000, plus benefits, such as subsidized health insurance.

Sykes accepted full-time employment at Green Cultural Communities (GCC). GCC offered Sykes an annual salary of $70,000 but no health insurance. Unfortunately, the promise of a new job was illusory. Sykes worked for GCC only from April 2 through April 10, 2009, when GCC informed her that it lacked the funds to pay her.

Sykes applied for unemployment benefits with the Minnesota Department of Employment and Economic Development. The department determined that Sykes was ineligible to receive unemployment benefits, and Sykes appealed.

At the hearing before a ULJ, Sykes testified that she had accepted Northwest's early-out offer in part because Northwest had agreed to continue to pay half of her health-insurance premium for several years unless she obtained new employment that provided health insurance.

The ULJ's findings and the record are light on the details of the cost and other elements of Sykes's Northwest insurance policy. But the ULJ did find that "Northwest Airlines paid half of her insurance premium." And Sykes testified that she contributed $400 per month to her health-insurance premium. She testified that comparable unsubsidized private health insurance would cost her $1,000 per month.

The ULJ concluded that Sykes was ineligible for unemployment benefits because when Northwest's contribution toward the cost of Sykes's health insurance is included, the GCC position was not substantially better than the Northwest position. Sykes requested reconsideration, and the ULJ affirmed her decision. This certiorari appeal follows.

## ISSUE

Did Sykes quit her employment to accept employment that provided substantially better terms and conditions?

## ANALYSIS

■ We review de novo a ULJ's decision that an applicant is ineligible to receive unemployment benefits. *Grunow v. Walser Auto. Group LLC,* 779 N.W.2d 577, 579 (Minn.App.2010). We may affirm the decision, remand it for further proceedings, or reverse or modify it if the relator's substantial rights have been prejudiced because the findings, inferences, conclusion, or decision is affected by an error of law or is unsupported by substantial evidence in view of the record as a whole. Minn.Stat. § 268.105, subd. 7(d) (2008). We view the ULJ's factual findings in the light most favorable to the decision and will not disturb them if they are substantially sustained by the evidence. *Grunow,* 779 N.W.2d at 580.

■ Generally, an applicant who quits employment is not eligible to receive un-employment benefits. Minn.Stat. § 268.095, subd. 1 (Supp.2009). But a quit-for-a-better-job exception exists where

the applicant quit ... to accept other covered employment that provided substantially better terms and conditions of employment, but the applicant did not work long enough at the second employment to have sufficient subsequent earnings to satisfy the period of ineligibility that would otherwise be imposed ... for quitting the first employment.

*Id.,* subd. 1(2). This case turns on whether Sykes's new but short-lived position with GCC offered "substantially better terms and conditions" than her position with Northwest. "Whether the new employment is substantially better is based on an objective comparison of the positions' terms and conditions, and not a comparison of which position is more suitable to the personal needs of an individual employee." *Grunow,* 779 N.W.2d at 580 (quotation omitted). Terms and conditions of employment are not limited to wages; they also include "benefits such as advancement opportunities, union representation, and group health, life, and disability insurance coverage." *Id.*

■ We first address Sykes's contention that substantial evidence does not support the ULJ's determination that Northwest paid half of her monthly health-insurance premium while she was employed by Northwest. The ULJ's findings are brief. But when questioned by the ULJ about the cost of health insurance "at Northwest," Sykes testified that she paid half ($400) of her monthly health-insurance premium and Northwest paid the other half. Although employment records would likely have been more informative than the brief testimony, we conclude that substantial evidence supports the ULJ's determi-

nation of Sykes's health-insurance costs during her employment with Northwest. *See Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,* 644 N.W.2d 457, 466 (Minn.2002) (defining substantial evidence as "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety"). Neither party chose to provide more detailed information or supporting documents, and the ULJ relied reasonably on the evidence presented.

■ We next address Sykes's primary argument on appeal, which is that the GCC position was substantially better than the Northwest position. Although GCC offered Sykes no health insurance benefits, Sykes contends that the two positions' health-insurance-related terms were the same because she continued to receive the same health insurance through Northwest even after she quit under Northwest's early-out agreement. Sykes therefore asks us to compare her $60,000 annual Northwest salary to her $70,000 annual GCC salary and to ignore the availability and value of the health-insurance benefit that only Northwest provided.

But Sykes's approach is not the one we have taken when objectively comparing the terms and conditions of employment positions. In *Grunow,* for example, the applicant (Grunow) quit a union-protected position that paid $22.70 per hour for a non-union position that paid $21.50 per hour. 779 N.W.2d at 578–79. The new employer offered Grunow health insurance that would have cost him approximately $220 more per month than health insurance through his former employer. *Id.* at 579. Grunow argued that he did not intend to purchase health insurance through his new employer because he was covered under

his wife's unrelated policy. *Id.* at 579–80. We rejected Grunow's contention that we should disregard his cost of health insurance at his new job on account of his decision not to buy that insurance. *Id.* at 581. We explained that a transitioning employee's personal decision whether to participate in the new employer's health-insurance plan is not part of the objective comparison of the terms of the positions. *Id.*

*Grunow* therefore stands for the proposition that the less-favorable health-insurance-related terms of a new position are not offset by an applicant's decision to forgo purchasing the insurance or by the applicant's coverage from a different source. Instead, we consider the availability and value of health insurance *offered by the employer* as compensation for the new position. Sykes's arrangement with Northwest for continued health insurance was not compensation by GCC for the GCC position, and it was therefore not a "term" of GCC employment. So we disregard the terms of Sykes's early-out agreement with Northwest and compare only the old and new employment positions based on the objective value of the terms and conditions offered by each employer for each position.

At Northwest, Sykes received an annual salary of $60,000. She also received health insurance, whose premiums she estimated would cost $12,000 annually on the open market. Sykes had to contribute only $4,800 a year for that insurance. So the combined Northwest salary and health insurance benefits equated to annual compensation of $67,200. By comparison, at GCC, Sykes was to receive an annual salary of $70,000, but with no health insurance. We recognize that a different way to value the Northwest insurance compensation for the comparison might be simply to consider Northwest's actual dollar amount con-

tributed to Sykes's premium. But that approach could result in misleading comparisons of employment terms because the cost to provide equally valuable benefits may vary significantly among different employers. Another approach would be to disregard all compensation except for salary, as the dissent urges. But the plain language of the statute directs us to compare all the relevant "terms and conditions" of the two positions, not merely to compare a single term. Minn.Stat. § 268.095, subd. 1(2). The dissent also contends that we should rely on the statute's policy statement in favor of awarding benefits. But the statute requires us only to construe narrowly, not to disregard, a provision that would preclude an applicant from receiving benefits. Minn.Stat. § 268.031, subd. 2 (Supp.2009). We will not be moved by the spirit of a statute to depart from the letter of the statute. Minn.Stat. § 645.16 (2010).

■ Under the proper comparative approach, the record establishes that the GCC position would yield Sykes a net annual compensation increase of only $2,800, or less than 5%, over the Northwest position. As we stated in *Grunow,* 779 N.W.2d at 580, a new position's terms and conditions must be "substantially better," not merely "better," for the better-job exception to apply. When deciding whether an employee had good cause to quit due to substantial adverse change in wages, the supreme court has held that a 21% decrease is substantial but a 2 to 4% decrease is not. *Sunstar Foods, Inc. v. Uhlendorf,* 310 N.W.2d 80, 84–85 (Minn.1981). The parties focus almost exclusively on terms rather than on conditions, and therefore so do we. Although the record suggests that the Northwest position might have been unionized and the GCC position was not, Sykes does not contend that this difference is relevant and the record says nothing of how union membership resulted in conditions that were more or less favorable at Northwest. We hold that the GCC position did not offer substantially better terms and conditions than the Northwest position.

## DECISION

Because the ULJ's challenged factual determination is supported by substantial evidence, and because the GCC position did not include terms and conditions that were substantially better than the Northwest position, the ULJ did not err by concluding that Sykes is ineligible to receive unemployment benefits.

**Affirmed.**

MINGE, Judge (dissenting).

I respectfully dissent. The question here is whether Tashika Sykes is eligible for unemployment benefits. The statute provides that an employee who quits a job is "ineligible for all unemployment benefits ... except when: ... (2) the [employee] quit the employment to accept other covered employment that provided substantially better terms and conditions of employment...." Minn.Stat. § 268.095, subd. 1 (Supp.2009). Minnesota has adopted a policy that the unemployment-benefit law "is remedial in nature and must be applied in favor of awarding unemployment benefits[.] ... [and that] any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed." Minn.Stat. § 268.031, subd. 2 (Supp.2009).

Here there is no dispute that Sykes earned $60,000 per year at her old job with Northwest Airlines and $70,000 at her new job with Green Cultural Communities. This is a 16 2/3% pay increase. The majority does not assert that this does not constitute a substantial change. Based on comparative wage levels, I conclude that

Sykes left for substantially better terms and conditions.

The issue is whether an employer's health-insurance arrangement renders insubstantial what are otherwise substantially better terms and conditions. Northwest Airlines provided health insurance for its employees, paying approximately $4,800 per year, half of the premium. Northwest Airlines offered Sykes and similarly situated long-term employees an "early-out" severance package that included continuing health-insurance coverage with Northwest Airlines paying half the premium. This was the same health-insurance benefit that these individuals had as employees of Northwest Airlines and constituted a fixed, portable health insurance benefit. Sykes and similarly situated employees had the same coverage whether they stayed and worked at Northwest Airlines, quit and did not work at all, or quit and found other employment without health insurance. This was not a personal benefit that depended on the employee's unique circumstances. Unless declined by an employee, this benefit was a cost to Northwest Airlines.

With this background, I submit that the answer to our issue is clear. When Sykes quit her $60,000 per year job at Northwest and took the $70,000 per year job at Green Cultural Communities, she had substantially better terms and conditions of employment. The majority's contrary conclusion essentially determines that Northwest Airlines' contractual health-insurance severance benefit is an economic handicap for Northwest Airlines' employees to overcome to access unemployment-insurance coverage. This stands the unemployment-insurance program on its head. It is not consistent with the recently adopted state policy in favor of *awarding* benefits and *narrowly construing* any statutory policy that would preclude the receipt of benefits.

Minn.Stat. § 268.031, subd. 2. Eligibility for unemployment benefits should be based on the circumstances of the worker, not the employer.

The majority relies on a recent decision of this court, *Grunow v. Walser Auto. Group LLC,* 779 N.W.2d 577 (Minn.App. 2010). At the outset, I note that the newly articulated state policy favoring the award of unemployment benefits adopted in 2009 did not apply to *Grunow,* which addressed the 2008 version of the statute. *See id.* at 579; *see also* Minn. Laws 2009, ch. 78, art. 4, § 1 (amending Minn.Stat. § 268.031), § 52 (providing that this amendment is effective August 2, 2009 and applies to all department determinations and ULJ decisions on or after this date).

Even with the new law, a review of the *Grunow* decision is of interest. Employee Grunow quit his job with a Walser car dealership for one with the ill-fated Hecker group. *Grunow,* 779 N.W.2d at 578–79. Financially, it was a curious move. Hecker was to pay Grunow $1.20 per hour less than Walser and family health insurance at Hecker cost employees about $220 per month more than at Walser. *Id.* at 578–79. Grunow explained that the advantage in working at the particular Hecker dealership was that he dramatically reduced his commuting cost and time, that he would have more family time, and that in contrast to the Walser position, he would actually be paid for all the hours that he worked. *Id.* at 579. Moreover, Grunow claimed that he would not buy health insurance because his wife had coverage through her job. This court in *Grunow* simply recognized that unique personal circumstances, such as the opportunity to spend more time with family and to take advantage of a spouse's health care coverage, are too subjective to be considered in determining whether the new job offers

substantially better terms and conditions of employment. *Id.* at 580–81.

Compared to Grunow, Sykes received a 16 2/3% pay increase, not a $1.20 per hour cut. Objectively viewed, Green Cultural Communities' failure to offer health insurance is a neutral factor because, like all other similarly situated Northwest Airlines alumni, Sykes had guaranteed, subsidized health insurance. The *Grunow* decision stands for the proposition that we should make an objective comparison of the terms and conditions of each position. *Id.* at 580. Given the newly adopted state policy, it is a mistake to read the *Grunow* interpretation of the statute expansively here to deny benefits. Objectively, Sykes left Northwest Airlines for a job at Green Cultural Communities with substantially better terms and conditions.

Based on the newly adopted state policy favoring eligibility for unemployment benefits, I would reverse the ULJ determination denying Tashika Sykes benefits.