Daniel HAUGEN, Respondent,

v.

SUPERIOR DEVELOPMENT,
INC., Relator,

Department of Employment and
Economic Development,
Respondent.

No. A11–1888.

Court of Appeals of Minnesota.

Aug. 6, 2012.

Daniel Haugen, Prior Lake, MN, pro se.

Rebecca J. Levine, Thiel, Campbell, Gunderson, Anderson and Levine PLLP, Edina, MN, for relator.

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; WRIGHT, Judge; and MUEHLBERG, Judge.*

## OPINION

ROSS, Judge.

Daniel Haugen quit his apartment-management job at Superior Development, Inc., after Superior reduced his weekly hours from 40 to 24. The department of employment and economic development deemed Haugen ineligible for unemployment benefits, but an unemployment law judge (ULJ) disagreed and held that Haugen is eligible because he quit his employment for good reason caused by Superior. Superior appeals by certiorari, challenging that holding and arguing that it was unlawfully prohibited from appearing before this court without legal counsel and that the Minnesota statute that requires employers but not unemployed individuals to pay fees associated with an appeal from a ULJ's decision is unconstitutional. We hold that corporations cannot appear before the court of appeals without counsel, that Minnesota Statutes section 268.105 is not unconstitutional, and that Haugen had good reason to quit caused by Superior's decision to reduce his work hours. We therefore affirm.

## FACTS

Daniel Haugen began working at Superior Development, Inc., in August 2008 managing 16 rental houses. Haugen was to work about 28 hours weekly for $15 an hour, plus commission on rent. Almost immediately Superior changed Haugen's management duties by adding an 18–unit apartment building. Haugen spent half of his time managing the apartment building, and his weekly hours increased to 40.

Haugen worked 40–hour weeks from September 2008 until late 2010. His hours then reduced to 32 because Superior believed he could complete his duties in less time. But Haugen's weekly hours soon crept back up to 40. Superior reduced his weekly hours again in late April 2011, this time from 40 to 24.

Haugen met with Superior's vice president, William Mellgren. He told Mellgren that he "didn't think he could make it on 24 hours." Haugen sought unemployment benefits that same month based on the reduction. *See* Minn.Stat. § 268.035, subd. 26 (2010). On April 25, 2011, he was approved for benefits on that basis for $365 per week.

Two months later, on June 29, 2011, Haugen quit his employment altogether. He again applied for unemployment benefits. The department of employment and economic development determined that he was ineligible to receive unemployment benefits because he quit his employment for personal reasons. He appealed to the ULJ, who found instead that Haugen quit because of a good reason caused by Superior. The ULJ reasoned that cutting Haugen's weekly hours from 40 hours per week to 24 caused a substantial drop in compensation that would compel an average, reasonable employee to quit rather than remain employed. The ULJ recognized that other reasons may have contributed to Haugen's quitting, including disagreements over work duties and money owed to him, but he found that Haugen's primary reason was the reduction in hours.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

The ULJ affirmed his decision after reconsideration, and Superior appeals the decision to this court by writ of certiorari, raising three issues.

## ISSUES

I. May a corporation appear before the court of appeals without being represented by legal counsel?

II. Does Minnesota Statutes section 268.105, subdivision 7, violate the equal protection clause of the Minnesota constitution?

III. Did the ULJ err by concluding that Haugen had good reason to quit caused by Superior?

## ANALYSIS

### I

Superior first raises a procedural challenge concerning its appeal. It contends that, as a corporation, it has the statutory right to appear in the court of appeals represented by a corporate agent who is not an attorney. When Superior filed its appeal with this court, the clerk's office notified it that its appeal papers were infirm because they had not been signed by an attorney. Superior refiled its papers through counsel as required, but it objects to the requirement. It argues that Minnesota Statutes section 481.02, subdivision 2 (2010), permits corporations to appear in actions in all Minnesota state courts in which they are named parties. The argument faces two equally dispositive, insurmountable obstacles. We therefore reject it.

■ The first obstacle to Superior's argument is a matter of statutory interpretation. We review the interpretation of statutes de novo. *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 49 (Minn.App.2009). Section 481.02, subdivision 2, states that "No corporation ... by or through its officers or employees or any one else, shall maintain, conduct, or defend, except in its own behalf when a party litigant, any action or proceeding in any court in this state." Superior's argument has initial appeal only; the supreme court has interpreted section 481.02 narrowly to mean that corporations may appear in court by or through its officers, employees or other agents only when those agents are also attorneys. *Nicollet Restoration, Inc. v. Turnham,* 486 N.W.2d 753, 755 (Minn. 1992). Based on the supreme court's interpretation, section 481.02 does not even purport to require courts to allow corporations to represent themselves through nonattorney agents of the corporation.

The second obstacle is even more formidable than the first. Section 481.02 not only *does* not mean that corporations may be represented in court through their nonattorney agents, it *cannot* mean that corporations may be represented in court through their non-attorney agents. The *Turnham* court recognized that, as a matter of constitutional delineation of governmental power, the court, and not the legislature, has the authority to decide who may and who may not practice law before the courts. *Id.* "Therefore, legislative enactments which purport to authorize certain classes to practice law in the courts of this state are not controlling upon the judiciary." *Id.* at 756. For that reason, section 481.02 was deemed unconstitutional to the extent it attempts to require courts to allow nonattorneys to appear in court on behalf of corporations. *Id.* at 755–56.

■ Superior is aware of this holding, but it counters it with its own constitutional separation-of-powers theory. It contends that *Turnham's* constitutional holding does not apply here because the court of appeals is not really part of "the judiciary," at least not in the same way that the

district court and supreme court are. On that same theory, Superior also suggests that this court is not bound by the supreme court's interpretation of section 481.02 as announced in *Turnham.* To support its theory, Superior highlights the provision of the constitution that authorizes the legislature to establish the court of appeals: "The judicial power of the state is vested in a supreme court, a court of appeals, if established by the legislature, a district court . . ., and [courts of jurisdiction inferior to the district court]." Minn. Const. art. VI, § 1. Superior maintains that because the court of appeals was "established by the legislature" (unlike the district court and supreme court, which were established without special legislation), the court of appeals is a "creature of the legislature" and is not a constitutional court. It follows, argues Superior, that the court of appeals is bound by all legislative pronouncements, even those pronouncements that exceed the legislature's constitutional authority when applied to the district or supreme courts.

Superior's argument has no merit. It reads far more into the term *"establish"* than the term allows. Apparent from its context, the term means only to *initiate.* Nothing in the clause authorizing the legislature to "establish" the court of appeals suggests anything more, and it certainly does not mean that the court of appeals exists in the government's legislative department rather than its judicial department. The constitution first holds that "[t]he powers of government shall be divided into three distinct departments: legislative, executive and judicial." Minn. Const. art. III, § 1. The three articles that immediately follow that declaration (IV, V, and VI) define those three distinct departments. The first of these defines the legislative department, and it includes no hint of judicial power. The third of the three departments—the judiciary—alone holds

"[t]he judicial power of the state." Minn. Const. art. VI, § 1. Specifically, that judicial power, as distinguished from the legislative power or the executive power, "is vested" only in the courts: "a supreme court," "a court of appeals, if established by the legislature," and "a district court" (as well as other courts or officers having jurisdiction inferior to the district courts). *Id.* So on its plain text, the constitution did not, by authorizing the legislature to "establish" a court of appeals, confer in the legislature any of the judicial power that it vested automatically in the court of appeals by virtue of its establishment.

The term "establish" also appears elsewhere in the constitution, but again, never in a manner that suggests any meaning other than *initiate.* For example, the sentence that immediately follows the presently questioned establishment reference holds that "[t]he supreme court consists of one chief judge and not less than six nor more than eight associate judges *as the legislature may establish.*" Minn. Const. art. VI, § 2 (emphasis added). Superior does not suggest that the legislature's "establishing" the number of supreme court members confers in the legislature any degree of the supreme court's judicial power. And we have no reason to believe that drafters of the 1982 constitutional amendment providing for the establishment of the court of appeals intended that the term "establish" would mean anything other than that term implies elsewhere. The constitution also provides that "the people of the state of Minnesota . . . ordain *and establish*" the constitution, and that the public debt may be contracted "*to establish* and maintain highways." Minn. Const. prmbl., art. XI, § 5. In each case, the term seems to carry the ordinary meaning. *See Webster's Dictionary of 1828* (defining "establish" to mean "To set and fix firmly or unalterably; to settle permanently" and to

"To enact or decree by authority and for permanence; to ordain; to appoint; as, to establish laws, regulations, institutions, rules, ordinances, & c."). And the term did not carry a materially different meaning in 1982. *See The American Heritage Dictionary* 448 (New College ed.1982) (defining "establish" to mean "To make firm or secure; fix in a stable condition").

The United States Constitution contains a materially identical provision to Minnesota's constitution, stating, "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. The "inferior courts" that Congress "may ... establish" has included the federal district court in 1789 and the federal circuit courts of appeals in 1891. *See* Judiciary Act of 1789, 1 Stat. 73 (1789); Judiciary Act of 1891, 26 Stat. 826 (1891). Superior gives us no reason to interpret the term "establish" under Minnesota's constitutional provision any differently from the interpretation of the same term under the similar federal provision. *See Deegan v. State*, 711 N.W.2d 89, 95 (Minn.2006) (holding that when interpreting the Minnesota constitution "[a]s a general rule we favor uniformity with the federal constitution"). The United States Supreme Court has never held that the bar against congressional authority to interfere with the judiciary under the separation-of-powers doctrine extends only to the Supreme Court by virtue of the constitutional authority in Congress to establish the district and appellate courts. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219–20, 115 S.Ct. 1447, 1453, 131 L.Ed.2d 328 (1995) (applying separation of powers doctrine to invalidate a provision of the Securities Exchange Act of 1934 that required federal district courts to reopen final judgments). The parallel federal doctrine protects the role of the independent judiciary from legislative overreaching because, like our state constitution, the federal Constitution "establish[es] *a judicial department* independent of the Legislative Branch." *Id.* (emphasis added). This rationale does not change on account of the additional Minnesota constitutional provision that the legislature may prescribe the jurisdiction of the court of appeals. The federal system likewise allows Congress to define inferior court jurisdiction without conferring any legislative authority to erase the line of separation between it and those courts.

█ In sum, the court of appeals is a court in which the people, through their constitution, have vested the state's judicial power. As a result, the legislature may no more direct who may practice law before the court of appeals than it may direct who may practice before the district court or the supreme court. Deciding "who may properly practice law before the courts of this state" is power "vested solely in the judiciary." *Turnham,* 486 N.W.2d at 755. And the question of who may practice before the courts has been decided. For these same reasons, we also reject as baseless Superior's related contention that this court is not bound by supreme court precedent. *See State v. Ward,* 580 N.W.2d 67, 74 (Minn.App.1998) (recognizing that the court of appeals cannot "overturn established supreme court precedent").

## II

█ Superior challenges the constitutionality of Minnesota Statutes section 268.105, subdivision 7 (2010). This court reviews questions of a statute's constitutionality de novo. *Associated Builders & Contractors v. Ventura,* 610 N.W.2d 293, 298 (Minn.2000). Minnesota statutes are presumed constitutional. *State v. Barker,*

705 N.W.2d 768, 771 (Minn.2005). The party challenging the constitutionality of a statute must establish that the statute violates the constitution beyond a reasonable doubt. *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 13 (Minn.1986). This court will exercise its power to declare a statute unconstitutional only with extreme caution and when absolutely necessary. *Walker v. Zuehlke,* 642 N.W.2d 745, 750 (Minn.2002).

Superior maintains that section 268.105, subdivision 7, violates the equal protection clause of the Minnesota constitution. That clause states that "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art 1, § 2. Superior contends that section 268.105, subdivision 7, unconstitutionally distinguishes between unemployed persons and employers who appeal a ULJ's determination. Portions of two provisions of section 268.105 reveal that Superior correctly observes that the statute treats unemployed persons and employers differently as it regards certain costs associated with an appeal to this court from a ULJ's decision:

> Any *employer* petitioning for a writ of certiorari *must pay* to the court the required filing fee and upon the service of the writ must furnish a cost bond to the department in accordance with the Rules of Civil Appellate Procedure. If the employer requests a written transcript of the testimony received at the evidentiary hearing conducted under subdivision 1, the *employer must pay* to the department the cost of preparing the transcript. That money is credited to the administration account.

Minn.Stat. § 268.105, subd. 7(b) (emphasis added).

> Upon issuance by the Minnesota Court of Appeals of a writ of certiorari as a result of an *applicant's* petition, the department must furnish to the applicant *at no cost* a written transcript of any testimony received at the evidentiary hearing conducted under subdivision 1, and, if requested, a copy of all exhibits entered into evidence. *No filing fee or cost bond is required of an applicant* petitioning the Minnesota Court of Appeals for a writ of certiorari.

*Id.,* subd. 7(c) (emphasis added).

■ Superior's argument does not approach the high burden to establish a statute's constitutional infirmity. It asserts that the statute fosters an unconstitutional disparity because two appealing parties who litigate administratively on the same matter are treated differently on appeal, with only one of them, the employer, having to pay a filing fee, cost bond, and transcript fee. But Superior cannot establish that it has been denied equal protection of the law unless it can prove that it was treated differently from a person with whom it is similarly situated. *See Peterson v. Minn. Dept. of Labor & Indus.,* 591 N.W.2d 76, 79 (Minn.App.1999), *review denied,* (Minn. May 18, 1999). Superior has not established this sort of similarity between employers and out-of-work former employees.

The public policy of the Minnesota Unemployment Insurance Program is to protect the economic security of involuntarily unemployed workers, and "[t]he public good is promoted by providing workers who are unemployed through no fault of their own a temporary partial wage replacement to assist the unemployed worker to become reemployed." Minn.Stat. § 268.03, subd. 1 (2010). This purpose is emphasized further by section 268.031: "This chapter is remedial in nature and must be applied in favor of awarding un-

**722**

employment benefits. Any legal conclusion that results in an applicant being ineligible for unemployment benefits must be fully supported by the facts." Minn.Stat. § 268.031, subd. 2 (2010).

In contrast, the statute is not meant to benefit employers specifically. Although employers fund the unemployment insurance program and an employer's tax·rate may increase based on benefits paid to applicants, *see* Minn.Stat. § 268.047, subd. 1 (2010), an employer does not pay unemployment benefits directly and a former employee's application for benefits is not a claim against an employer. *See* Minn.Stat. § 268.069, subd. 2 (2010). It is not remarkable that a statute designed to protect unemployed individuals also allows those individuals to raise disputes over their claim to unemployment benefits without facing all litigation costs.

Entities that employ others and persons who are not employed are simply not similarly situated as it concerns the unemployment system. Superior in essence makes more of a public-policy argument than an equal protection argument; it would have us hold unfair the legislatively crafted requirement that employers pay certain costs that unemployed individuals presumably have no means to pay. The legislative floor is the better venue for that argument than the courts.

Superior's equal protection argument also fails on another ground. Superior asserts that its access to the court is impaired by the statutory requirement that it pay costs that individual applicants are spared. This is not so. The assertion overlooks the fact that *all* litigants with means generally must pay various court fees to fund the courts, providing access to them and others. The challenged statute here does not impose any unique *burden* on the employer; it instead provides an *exception* for others, relieving those who

are presumably financially destitute from the burden imposed generally on other litigants. Courts—ours included—have traditionally spared indigent parties from paying litigation costs that others must pay. *See, e.g.*, Minn.Stat. § 563.01 (2010) (authorizing commencement, defense, or appeal of an action without prepayment of fees, costs, and security for costs if the natural person provides an affidavit stating, among other things, that he is unable to pay the fees, costs, and security for costs); Minn.Stat. § 611.21 (2010) (allowing an indigent defendant to recover costs for services necessary to his defense); Minn. R. Civ.App. P. 109.01 (allowing waiver of the filing fee and cost bond, and payment of costs for the transcript and reproducing briefs if a party is unable to pay). These need-based exceptions do not penalize those with means; they merely exempt those without them. *Cf. State ex rel. Danielsen v. Tahash*, 273 Minn. 286, 291, 141 N.W.2d 390, 393 (1966) ("[A] pauper may appeal from the judgment of conviction without payment of a filing fee and ... failure to permit such an appeal would constitute a denial of his constitutional rights under the equal protection clause of the Fourteenth Amendment."). We are not persuaded by Superior's equal protection argument.

### III

Superior challenges the ULJ's determination that Haugen is eligible for unemployment benefits. We may remand, reverse, or modify a ULJ's decision if the relator's substantial rights were prejudiced by fact findings that are unsupported by substantial evidence or by a decision that is affected by an error of law, that is made on unlawful procedure, or that is arbitrary. Minn.Stat. § 268.105, subd. 7(d)(3)–(6). We review the ULJ's factual findings in the light most favorable to his decision and

give deference to his credibility determinations. *Skarhus v. Davanni's, Inc.,* 721 N.W.2d 340, 344 (Minn.App.2006).

■ Superior argues that Haugen is ineligible for unemployment benefits because he did not have a good reason to quit his job. It is not disputed that Haugen quit. Generally, an employee who quits employment is not eligible for unemployment benefits. Minn.Stat. § 268.095, subd. 1 (2010). But an exception applies if the employee quit because of a good reason caused by the employer. *Id.* A good reason caused by the employer is one that is directly related to the employment, that is adverse to the employee, and that "would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.,* subd. 3 (2010). We review whether an employee had a good reason to quit de novo. *Munro Holding, LLC v. Cook,* 695 N.W.2d 379, 384 (Minn.App.2005).

Superior contends that because Haugen continued to work for two months after his work schedule was reduced, he didn't really quit because of the reduction in hours. It asserts that Haugen quit his employment instead because he was upset with his supervisors' attitude towards him, recognizing that a poor relationship with one's employer does not constitute a good reason to quit. *See Ryks v. Nieuwsma Livestock Equip.,* 410 N.W.2d 380, 382 (Minn.App.1987). But Haugen testified that the main reason he quit was the reduction of his weekly hours from 40 to 24. The ULJ believed Haugen's testimony that his primary reason for quitting was the reduction in his hours, and we must defer to the ULJ's factually supported credibility determination.

Superior argues alternatively that the reduction was not a good reason to quit. But caselaw consistently establishes that a substantial wage or hours reduction is good reason to quit. *Wood v. Menard, Inc.,* 490 N.W.2d 441, 443 (Minn.App.1992); *Danielson Mobil, Inc. v. Johnson,* 394 N.W.2d 251, 253 (Minn.App.1986); *see also Scott v. The Photo Ctr., Inc.,* 306 Minn. 535, 535–36, 235 N.W.2d 616, 616–17 (1975) (holding that a 25–percent wage reduction constituted good reason to quit employment).

■ Haugen's drop from 40 hours to 24 hours is substantial enough to constitute good reason to quit his employment. It represents a 40–percent drop in weekly pay from $600 to $360. Even if Haugen was working only 32 hours before the drop, the reduction in wages is still 25 percent, and it similarly constitutes good reason to quit under the caselaw that binds our decision.

Superior maintains that the reduction to 24 hours was not substantial because Haugen was originally hired on a part-time basis at 28 hours. Superior's argument overlooks the fact that Haugen was assigned management of the 18–unit apartment complex in addition to the rental houses he had been hired to manage for 28 hours a week. It also overlooks the fact that Haugen worked 40 hours per week for more than two years and that the reduction to 32 hours was short-lived. The ULJ appropriately refused to measure the significance of the reduction on the original 28–hour arrangement.

Superior next contends that, because an employee is eligible for unemployment benefits when his hours are reduced below 32 hours per week and Haugen received those benefits, it was unreasonable for Haugen to become unemployed instead of continuing to work 24 hours while collecting unemployment benefits. *See* Minn. Stat. § 268.035, subd. 26 ("An applicant is considered 'unemployed' (1) in any week that the applicant performs less than 32

hours of service in employment, covered employment, noncovered employment, self-employment, or volunteer work; and (2) any earnings with respect to that week are less than the applicant's weekly unemployment benefit amount."). Based on the consistent case law that establishes that a reduction in wages of 25 percent or more is good reason to quit caused by the employer, we must reject the argument. The statute has no express requirement that an employee must continue working at a substantial drop in hours, and the caselaw does not support it.

■ Superior argues lastly that Haugen lost the right to claim that he quit for good reason caused by Superior because he never gave Superior an opportunity to address his concern over the reduction. An adverse working condition is not a good reason for quitting caused by the employer unless the employee complained to the employer and gave the employer a reasonable opportunity to correct the condition. Minn.Stat. § 268.095, subd. 3(c) (2010). After his hours were reduced, Haugen met with Mellgren and told him that "he didn't think he could make it on 24 hours [a week]," and Mellgren thought that Haugen was quitting but did not seek to correct the unsatisfactory condition. We hold that Haugen gave Superior clear notice that the reduction could force him to quit, giving Superior the opportunity to correct the condition beforehand.

The ULJ did not err by determining that Haugen had good reason to quit caused by Superior.

### DECISION

■ The requirement that corporations be represented by legal counsel applies to proceedings before the court of appeals. Minnesota Statutes section 268.105, subdivision 7, does not infringe on an employer's right to equal protection by virtue of the statute's excepting unemployed persons from having to pay court costs that employers must pay. Haugen is eligible for unemployment benefits because a substantial reduction in hours is good reason to quit caused by the employer. We affirm the ULJ's decision.

**Affirmed.**