Shouna THAO, Relator,

v.

COMMAND CENTER,
INC., Respondent,

Department of Employment and
Economic Development,
Respondent.

No. A12–0068.

Court of Appeals of Minnesota.

Oct. 22, 2012.

Benjamin L. Weiss, Laura S. Melnick, Southern Minnesota Regional Legal Services, St. Paul, MN, for relator.

Command Center, Inc., Post Falls, Idaho (respondent employer) Lee B. Nelson, Amy R. Lawler, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent department.

Considered and decided by BJORKMAN, Presiding Judge; JOHNSON, Chief Judge; and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.*

Relator Shouna Thao challenges a decision by an unemployment law judge (ULJ) that she is ineligible for unemployment benefits because she quit her employment without good reason caused by her employer. In this certiorari appeal, Thao argues that she is eligible for benefits because she had good reason to quit caused by her employer after it significantly decreased her hours of work and that she was not required to complain before quitting. Because an applicant who quits due to a substantial reduction in her hours of work is eligible for unemployment benefits without having to complain to the employer first, and because here questions remain regarding whether the employer's actions were adverse to relator, and, if so, whether those actions would have compelled an average, reasonable worker to quit, we reverse and remand.

## FACTS

Thao was hired as a permanent employee by respondent Command Center, Inc., a staffing company that provides temporary labor for industries and businesses throughout the Twin Cities. Thao was employed by Command Center for a total of five weeks, from July 26 through August 31, 2011. Command Center assigned her to work primarily with one client, Twin

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

Cities Bagels, which had a contract with Command Center for temporary workers. Command Center anticipated that Twin Cities Bagels would need perhaps 75 temporary workers in mid-August and Thao's job included recruiting employees for Command Center to fulfill Twin Cities Bagels' needs.

Thao and her direct manager, Mark Baloun, did not have the same understanding of the terms of her employment. Thao testified that when she was hired, she was told that she would work at least 32 hours per week and that Command Center planned to hire more laborers in mid-August, with the possibility that her hours could increase up to 40 hours per week. When asked whether Command Center "promised" her a set number of hours, Thao responded, "I don't remember a promise," but she reiterated that she was told she would be working 32 hours per week with the possibility of up to 40 hours when additional employees were hired in mid-August. According to Baloun, however, Thao was hired for "primarily part-time work," "there were never any promises" for permanent full-time work made to her, and her hours were "going to depend upon the client's needs."

During her first several weeks of employment, which included training, Thao worked nearly 40 hours per week. Thereafter she worked 32 hours per week. In her last week of employment, however, after Twin Cities Bagels cancelled its orders with Command Center, Thao's hours were reduced to 16 to 20. Thao testified that she did not ask Command Center for more hours, but she did ask whether more employees could be hired so that she would have more work to do; Command Center said that there was nothing it could

do and that it was working on getting contracts from other companies. Thao testified that because her employer was already under stress, she did not ask directly for more hours.

When Thao saw that she was scheduled for only eight to ten hours the following week, she quit her employment. She acknowledged that she did not complain to anyone at Command Center about her hours being reduced before quitting. Baloun testified that if Thao had not quit, her hours would have likely increased again to "somewhere around 24 to 30 hours a week."

Thao established an unemployment-benefit account with respondent Minnesota Department of Employment and Economic Development (DEED). DEED determined that Thao was eligible for benefits because even though she quit, her hours had been "significantly reduced" and she therefore quit "for a good reason caused by the employer."

■ Command Center brought an administrative appeal of the eligibility determination. Following an evidentiary hearing, the ULJ found that Thao had accepted the job expecting to work full time.[1] Because she had not complained to Command Center about the reduction in hours and did not give it a reasonable opportunity to correct the problem, the ULJ concluded that she "quit the employment for reasons other than good reason caused by the employer and is ineligible for unemployment benefits."

Thao requested reconsideration, arguing that she was justified in not complaining to her employer because she thought it would have been futile to do so. The ULJ affirmed his earlier decision that Thao was

1. Working 32 hours a week or more is considered full-time employment for purposes of the unemployment-insurance law. *Lamah v. Do-* *herty Emp't Grp., Inc.*, 737 N.W.2d 595, 599–600 (Minn.App.2007).

not eligible for benefits, and emphasized that "Thao does not dispute she did not complain about her reduction in hours. Her reason for not complaining does not eliminate the statutory requirement to do so and give the employer an opportunity to correct the issue." The ULJ concluded that even though "it may be that a reasonable person would be compelled to quit in her circumstances ... because [Thao] did not complain to the employer and give the employer an opportunity to correct the matter, she did not quit because of a good reason caused by the employer."

Thao appeals the ULJ's decision to this court by writ of certiorari.

## ISSUE

When an employer adversely changes an employee's terms of employment by substantially decreasing the employee's hours of work, must the employee complain to the employer and give the employer a reasonable opportunity to correct the adverse change before the employee is eligible for unemployment benefits based on a quit for good reason caused by the employer?

## ANALYSIS

■ This court may remand, reverse, or modify the decision of the ULJ if the substantial rights of the relator may have been prejudiced because the findings or decision are affected by error of law, unsupported by substantial evidence, or arbitrary or capricious. Minn.Stat. § 268.105, subd. 7(d)(4)–(6) (2010).

■ The determination that an employee quit without good reason attributable to the employer is a legal conclusion, which this court reviews de novo. *Nichols v. Reliant Eng'g & Mfg., Inc.,* 720 N.W.2d 590, 594 (Minn.App.2006). The ULJ's conclusion, however, must be based on factual findings that have substantial evidentiary support. *Id.* This court reviews a ULJ's factual findings in the light most favorable to the decision and will not disturb them when they are supported by substantial evidence. *Skarhus v. Davanni's Inc.,* 721 N.W.2d 340, 344 (Minn.App.2006). This case presents an issue of statutory interpretation, which is a question of law that we review de novo. *Bukkuri v. Dep't of Emp't & Econ. Dev.,* 729 N.W.2d 20, 21 (Minn.App.2007).

The unemployment-insurance law "is remedial in nature and must be applied in favor of awarding unemployment benefits," and "any statutory provision that would preclude an applicant from receiving benefits must be narrowly construed." Minn. Stat. § 268.031, subd. 2 (2010). However, there is "no presumption of entitlement or nonentitlement to unemployment benefits" and "equitable or common law denial or allowance of unemployment benefits" is not permitted. Minn.Stat. § 268.069, subds. 2, 3 (2010).

*Statutory provisions*

Employees who quit employment are not eligible for unemployment benefits, subject to certain exceptions. Minn.Stat. § 268.095, subd. 1 (2010). The exception at issue here applies when employees quit "because of a good reason caused by the employer." Minn.Stat. § 268.095, subd. 1(1). Good reason is defined as follows:

(a) A good reason caused by the employer for quitting is a reason:

(1) that is directly related to the employment and for which the employer is responsible;

(2) that is adverse to the worker; and

(3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment.

(b) The analysis required in paragraph (a) must be applied to the specific facts of each case.

(c) If an applicant was subjected to adverse working conditions by the employer, the applicant must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting.

(d) A reason for quitting employment is not considered a good reason caused by the employer for quitting if the reason for quitting occurred because of the applicant's employment misconduct.

Minn.Stat. § 268.095, subd. 3 (2010).

■ Generally, "a substantial pay reduction gives an employee good cause for quitting." *Scott v. Photo Ctr., Inc.*, 306 Minn. 535, 536, 235 N.W.2d 616, 617 (1975); *Haugen v. Superior Dev., Inc.*, 819 N.W.2d 715, 723 (Minn.App.2012) (holding that "caselaw consistently establishes that a substantial wage or hours reduction is good reason to quit"); *see Sunstar Foods Inc. v. Uhlendorf*, 310 N.W.2d 80, 85 (Minn.1981) (holding that "wage cuts of 21–26 percent unilaterally imposed by the employer" were so unreasonable that employees had no alternative but to leave, in the context of a lockout from employment). Here, the ULJ did not conclude that the reduction in hours gave Thao good reason to quit, because he ruled that Thao was ineligible for unemployment benefits based on her failure to complain to her employer before quitting, pursuant to subdivision 3(c). Thao and DEED likewise confine their arguments on appeal solely to the issue of whether or not Thao was required to complain about her reduced hours before quitting in order to be eligible for benefits. This court has not yet addressed in a published opinion the exact issue presented here.[2]

*Ambiguity of statute*

We must address initially the question of whether the statute that is the focus of this appeal is ambiguous. Both parties essentially argue that it is not. Yet their "plain language" reading of the statute leads them to entirely different conclusions.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2010). A statute's language is ambiguous only when the language is subject to more than one reasonable interpretation. *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999). "If the meaning of a statute is unambiguous, we interpret the statute's text according to its plain language. If a statute is ambiguous, we apply other canons of construction to discern the legislature's intent." *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn.2010) (citations omitted). "[W]ords and phrases are construed according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08(1) (2010). "Every law shall be construed, if possible, to give effect to all

2. At least one very recent published case has applied subdivision 3(c) to a quit based on a reduction in hours and addressed whether the employee had complained first. *See Haugen*, 819 N.W.2d at 724. But the question raised here—whether the complaint requirement even applies in the case of a reduction of hours—was neither raised nor addressed. The need to complain was not challenged in *Haugen*; it was assumed. Any unpublished opinions that would appear to run counter to our position here would, of course, be of no precedential value and would be held to their particular facts under Minn.Stat. § 480A.08, subd. 3(c) (2010) (stating that unpublished opinions of the court of appeals are not precedential).

its provisions." Minn.Stat. § 645.16. "A statute should ordinarily be construed as a whole to harmonize all its parts and, whenever possible, no word, phrase or sentence should be deemed superfluous, void or insignificant." *Owens v. Federated Mut. Implement & Hardware Ins. Co.*, 328 N.W.2d 162, 164 (Minn.1983). The fact that "able lawyers, after careful study of the provisions of the statute, have taken opposite views as to its meaning supports the conclusion that the language itself does not explicitly convey the intention of the legislature and that construction is necessary." *Mattson v. Flynn*, 216 Minn. 354, 358, 13 N.W.2d 11, 14 (1944).

The essence of the parties' dispute in this case is whether a reduction in hours is an adverse working "condition" that triggers subdivision 3(c)'s requirement to complain before an employee's quit can be deemed a good reason caused by the employer. *See* Minn.Stat. § 268.095, subd. 3(c). Briefly, Thao argues that a reduction in hours is a "term" of employment, rather than a "condition," so that subdivision 3(c) does not apply to those applicants such as herself who quit due to an adverse change in hours. DEED contends that "conditions" is a broad term that includes a reduction in hours, so that the requirement to complain applies to all applicants who allege they quit for good reason caused by the employer and includes those such as Thao who quit due to reduced hours.

Thao makes three arguments to support her plain-language argument that the legislature did not intend that the complaint requirement in subdivision 3(c) apply to the type of adverse action she experienced, namely, reduced hours of employment. First, she correctly notes that the three-part analysis used in subdivision 3(a) to determine whether the employee quit for good reason caused by the employer "must be applied to the specific facts of each case, pursuant to subdivision 3(b)." *See* Minn.Stat. § 268.095, subd. 3(a), (b). Because the legislature did not likewise mandate that the complaint requirement of subdivision 3(c) "be applied to the specific facts of each case," Thao concludes that it is not meant to apply to the specific facts of each case. DEED, not surprisingly, disagrees and argues that there is no case law to support the proposition that applicants are exempted from statutory provisions solely because they do not contain admonishments found in nearby provisions.

Second, Thao notes that the legislature intentionally used only the word "conditions" in subdivision 3(c), rather than the phrase "terms and conditions," which it used elsewhere in section 268.095. *See* Minn.Stat. § 268.095, subds. 1(2) (creating an exception to ineligibility based on a quit where a worker quits one job in order to "accept other covered employment that provided substantially better terms and conditions of employment," under certain circumstances), 3(f)(1) (addressing good reason to quit based on sexual harassment and requiring that submission to sexually related conduct or communications was made a "term or condition of the employment") (2010); *but see* Minn.Stat. § 268.035, subd. 23a(g) (Supp.2011) (stating in relevant part that employment is not considered suitable if "the wages, hours, or other conditions of employment are substantially less favorable than those prevailing for similar employment in the labor market area").

DEED acknowledges that the legislature has not specifically defined "adverse working conditions" in the statute, but contends that this court "has considered an extraordinarily broad range of such conditions, from wage and hour cuts to demotions, from mean supervisors to office relocations" in determining whether the quit

was for good reason caused by the employer. It contends that a statutory phrase is not ambiguous simply because it encompasses a broad category. Citing *Polley v. Gopher Bearing Co.*, DEED further argues that Thao's arguments have no support in case law and that this court has repeatedly interpreted subdivision 3(c) as conjunctive to the definition in subdivision 3(a). 478 N.W.2d 775, 779 (Minn.App. 1991) (holding, in reviewing a prior version of the statute that does not contain these subdivisions, that the relator who complained to her employer about her reduced hours before quitting was eligible for benefits), *review denied* (Minn. Jan. 30, 1992).

Finally, Thao bolsters her argument that she should prevail under the plain language of the statute by citing the qualifier "if" at the beginning of section 268.095, subdivision 3(c), which provides: "If an applicant was subjected to adverse working conditions by the employer...." She contends that the word "if" signifies that the legislature intended the complaint provision to apply only in some but not all fact scenarios.[3] She further argues that if the legislature had intended the complaint requirement in subdivision 3(c) to apply to all applicants for benefits who meet the requirements of subdivision 3(a), then the

legislature would have used the phrase "terms and conditions" of employment at subdivision 3(c), rather than only "conditions" of employment.

Ultimately, in determining whether ambiguity exists in the statute under consideration, we are confronted with questions: In comparing the words "conditions" and "terms and conditions" used in different sections of the unemployment-insurance statute are we able to discover what the legislature meant?[4] If "conditions" in subdivision 3(c) includes hours, would that render the word "terms" in the phrase "terms and conditions" superfluous in sections where that phrase is found? What does the word "if" signify in subdivision 3(c)? Our review of the legislature's inconsistent use of "terms" and "conditions" in the several sections of the statute now under consideration causes us to conclude that the meaning of the term "adverse working conditions" in subdivision 3(c) is ambiguous. Here, the parties' intelligent and reasonable yet diametrically opposed plain-language interpretations of the statutory language support our conclusion that the statute is ambiguous. Having so concluded, we next undertake a review of legislative history, looking first for guidance from Minn.Stat. § 645.16.

3. Common sense tempts a conclusion that a complaint gives an employer knowledge of a situation of which it might not be aware. If that were indeed the "test," wouldn't the fact that the employer clearly may be held to be aware of the change in hours or wages that it implemented assure exemption of an employee affected by those decisions of the employer from complaining? In view of the very complicated and murky legislative history discussed later, however, such a common-sense conclusion would appear to be over-simplistic.

4. Illustrative of the thorny consequences resulting from using terms inconsistently or imprecisely is the following exchange between the parties in their briefs before this court.

As referred to earlier, DEED states in its respondent's brief the following language: "There is a specific reason why the statute specifies 'adverse working conditions' in both subdivisions 3(a) and 3(c), and not simply 'terms and conditions of employment.'" Relator responds by saying: "Respondent goes so far as to incorrectly state that subdivision 3(a) of the statute includes the phrase 'adverse working conditions'; it does not." *See* Minn. Stat. § 268.095, subd. 3(a)(2) (providing that good reason caused by the employer for quitting includes a reason "that is *adverse to the worker*") (emphasis added), (c) (referring to applicant who "was subjected to *adverse working conditions* by the employer") (emphasis added).

*Statutory interpretation*

When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters:

(1) the occasion and necessity for the law;

(2) the circumstances under which it was enacted;

(3) the mischief to be remedied;

(4) the object to be attained;

(5) the former law, if any, including other laws upon the same or similar subjects;

(6) the consequences of a particular interpretation;

(7) the contemporaneous legislative history; and

(8) legislative and administrative interpretations of the statute.

Minn.Stat. § 645.16. We therefore review the legislative history of subdivision 3 to aid in our interpretation of the statute and to ascertain the legislative intent.

 "We must presume that every statute has a purpose and that no statutory language should be deemed superfluous or insignificant." *Urban v. Am. Legion Dep't of Minn.*, 723 N.W.2d 1, 5 (Minn. 2006). "[D]istinctions in language in the same context are presumed to be intentional, and we apply the language consistent with that intent." *In re Stadsvold*, 754 N.W.2d 323, 328–29 (Minn.2008). "The use of different words in ... two provisions supports the conclusion that the sections address different behavior." *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 709 (Minn. 2012) (addressing construction of regulations, which are construed in the same manner as statutes); *see Torgelson v. Real Prop. Known as 17138 880th Ave.*, 749 N.W.2d 24, 27 (Minn.2008) ("Although 'debt' and 'liability' can be synonymous, it is presumed that if the Constitution's authors used two different words, they intended two different meanings.").

The relevant part of the unemployment-insurance statute has been amended twice, in 1999 and 2004. We first compare the current version of the statute to the statute in existence before the 1999 amendments. In 1998, "good reason caused by the employer for quitting" was defined as a reason "(1) that is directly related to the employment and for which the employer is responsible; and (2) that is significant and would compel an average, reasonable worker to quit." Minn.Stat. § 268.095, subd. 3(a) (1998). In 1999, the legislature contemporaneously added, in relevant part, two subsections to the definition of "good reason [to quit] caused by the employer." In the first subsection, which is essentially the same as the language of subdivision 3(c) today, the legislature explicitly required that the applicant complain to the employer and give it an opportunity to correct the adverse condition before it can provide the applicant with good reason to quit: "If a claimant was subjected to adverse working conditions by the employer, the claimant must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." 1999 Minn. Laws ch. 107, § 44, at 422.

However, the second subsection specifically referred to adverse changes to "wages, hours, or other terms of employment" and provided: "A substantial adverse change in the wages, hours, or other terms of employment by the employer shall be considered a good reason caused by the employer for quitting unless the change occurred because of the claimant's employment misconduct." *Id.* But, unlike the first subsection, the second subsection

contained no explicit requirement that the employee must complain to the employer before having good reason to quit and becoming eligible for unemployment benefits.

In legislative testimony addressing the 1999 amendments, representatives from DEED described the Senate bill containing this language as a noncontroversial bill "codify[ing] common law in a number of areas." Hearing on S.F. 1218 before the S. Comm. on Jobs, Energy, & Cmty. Dev. (Mar. 19, 1999) (statements of Jack Wiedenbach, Assistant Commissioner, Department of Economic Security). The legislators asked the representatives to highlight the sections of the bill that affected benefits or implemented the most significant changes. *Id.* The bill was described as making changes to benefits in three areas, none of which concerned when an employee quits for good reason caused by employer. *Id.* (statements of Lee Nelson, attorney, Department of Economic Security). In the discussion that ensued, there were no references to or questions about the changes made to the definition of good reason to quit. *Id.* As described by senate counsel and research, the legislature's stated intent was to "codif[y] more common law on a good reason caused by employer for quitting." Minn. Senate Counsel and Research, Summary of Senate File 1218 (Mar.1999); *see* Minn. House Research, Bill Summary of House File 877 (describing subdivision 3, in relevant part, as providing for conditions under which a quit is considered the result of a good reason caused by the employer, including "substantial adverse changes in working conditions if the employee has given the employer the opportunity to correct them").

Our research has shown that under common law prior to the 1999 amendments, the "general rule [was] that a substantial pay reduction gives an employee good cause for quitting." *Scott,* 306 Minn. at 536, 235 N.W.2d at 617; *see also Sunstar Foods,* 310 N.W.2d at 85. Our research has further shown that in many cases addressing this issue, there was no discussion of any requirement that the employee first complain about the reduction before quitting. *See id.* at 535–36, 235 N.W.2d at 616–17 (stating that a 25 percent reduction in wages resulting from switch to commission from fixed salary established good cause for quitting, but containing no discussion of complaint or requirement for complaint before quitting); *McBride v. LeVasseur,* 341 N.W.2d 299, 300 (Minn.App.1983) (stating that a 30 percent reduction in pay resulting from change to hourly pay rate from monthly salary established good cause for quitting, but containing no discussion of complaint or requirement for complaint before quitting).

Our review of the legislative history of the 1999 amendments permits us to infer that the stated purpose of those amendments—codification of the common law—was achieved by inclusion of a statutory requirement that a quit based on adverse working conditions must be preceded by a complaint, and the absence of a parallel complaint requirement for a quit based on changes in wages, hours, or other terms of employment. We conclude that the 1999 amendments addressing the requirement to complain were not intended to apply to employees who quit because of changes in hours.

In 2004, the legislature again amended the definition of good reason to quit. And we are again required to answer here the question that we faced in reviewing the legislative history of the 1999 amendments. Do the 2004 amendments to the definition change whether subsection 3 requires a complaint from employees whose hours are changed before a quit can be considered to be for good reason caused by the employ-

er? Informing our search for an answer is recognition that in 2004 the legislature replaced the phrase "a substantial adverse change in the wages, hours, or other terms of employment by the employer," which had been added in the 1999 amendments, with "reason for quitting" so that the subsection read: "A reason for quitting employment shall not be considered a good reason caused by the employer for quitting if the reason for quitting occurred because of the applicant's employment misconduct." [5] 2004 Minn. Laws ch. 183, § 63, at 300. Today that is codified in Minn.Stat. § 268.095, subd. 3(d).

When the legislature adopted the 2004 changes, its stated intent was to broaden the definition of "good reason to quit," to ensure that sexual harassment constituted a per se reason to quit, and to require that a reasoned, fact-based analysis of eligibility for benefits would be conducted on a case-by-case basis. *See* Hearing on H.F. 2235 before the House Comm. on Commerce (Feb. 26, 2004) (statements of Rep. Tony Sertich). Importantly, however, there was no discussion of the removal of the phrase "a substantial adverse change in the wages, hours, or other terms of employment," or of the effect of the removal on the law that an employee subject to this adverse change did not have to complain before quitting.

While the 2004 removal of the specific reference to "wages, hours, or other terms of employment" appears to have created the ambiguity in the statute, other provisions that refer to "terms and conditions" were unchanged in 2004. *See, e.g.,* 2004 Minn. Laws. ch. 183, §§ 62, at 298 (retaining, in the section 268.095, subdivision 1

exception to ineligibility, language addressing one who quit "to accept other covered employment that provided substantially better terms and conditions of employment," in certain circumstances), 63, at 299–300 (retaining, in the section 268.095, subdivision 3 exception to ineligibility for good reason to quit based on sexual harassment, the provision that "submission to the conduct or communication is made a term or condition of the employment"). This posture informs our search for an answer to the question of whether "terms" might be synonymous with "conditions." If it might reasonably be concluded that synonymy exists, might that irrevocably lead to a conclusion urged by DEED—that the grasp of subdivision 3(c) is broad enough to capture employees in the position of Thao?

Both our review of legislative history and our review of caselaw lead us to conclude that "terms" and "conditions" are not synonymous. Reasonably, working "conditions" are circumstances under which employees work, such as the social and physical environment, and include relationships with coworkers and whether certain safety measures are in place or utilized. *See Nichols,* 720 N.W.2d at 595–97 (referring to adverse working conditions where coworker had used derogatory obscenities toward relator; allowed doors to swing closed on her; improperly maneuvered a forklift near her; and kicked open a break room she was in, giving her good reason to quit employment after complaining to employer who failed to take effective action). In contrast, this court has cited "terms" of employment as including annual

---

**5.** DEED contends that current subdivisions 3(a) and 3(c) refer to "adverse working conditions" rather than simply "terms and conditions of employment," as found elsewhere in the statute, to ensure that the condition be adverse. *See Kehoe v. Minn. Dep't of Econ.*

*Sec.,* 568 N.W.2d 889, 891 (Minn.App.1997) (finding no significant adverse action by the employer who gave its employee the choice of remaining employed or voluntarily resigning and receiving a bonus). We do not find this argument persuasive.

compensation and health insurance. *See Sykes v. Nw. Airlines, Inc.*, 789 N.W.2d 253, 256–57 (Minn.App.2010) (noting that parties focused almost exclusively on "terms" rather than "conditions," and that this court would do the same). "Terms" of employment such as wages, hours, and health insurance could be described as including those terms of employment that are contractual in nature. *See id.*

After careful consideration, we conclude that the 2004 amendments do not alter the fact that the contemporaneous addition of the two subsections in 1999 distinguishing between "adverse working conditions" and "wages, hours, or other terms of employment" made it clear that the legislature never intended that a significant reduction in hours was to be captured by the language providing that an employee who quits must have first complained of the "adverse working conditions" before quitting.

Unquestionably, this court has travelled an arduous journey in arriving at a decision that employees who quit due to adverse changes to their employer's unilateral reduction in hours need not first complain to their employer before quitting. We believe it to be a well-reasoned decision, however, one fully consistent with the public policy of Minnesota's unemployment-insurance law and its unquestioned remedial nature. Ultimately, the legislature has the authority to revisit the issue addressed here and clarify where clarification is desirable or required.

█ We cannot rest our decision, however, with a declaration of the limited scope of subdivision 3(c). DEED correctly notes that the ULJ did not make a determination as to whether the employer's actions in reducing Thao's hours of work were actually adverse to her, and, if so, whether those actions would have caused an average, reasonable employee to quit rather than remain in employment. Thus, these questions of fact remain that are more appropriately answered by a finder of fact, here the ULJ, than by this court. We, therefore, reverse and remand.

**Reversed and remanded.**