**Shirley NICHOLS, Relator,**

v.

**RELIANT ENGINEERING & MANUFACTURING, INC., Respondent,**

**Department of Employment and Economic Development, Respondent.**

No. A05–2165.

Court of Appeals of Minnesota.

Aug. 29, 2006.

Shirley Nichols, East Bethel, MN, pro se relator.

David M. Wilk, Sarah L. Beuning, Larson King, LLP, Saint Paul, MN, respondent Reliant Engineering & Mfg., Inc.

Linda Alison Holmes, Department of Employment and Economic Development, St. Paul, MN, respondent DEED.

Considered and decided by WILLIS, Presiding Judge, LANSING, Judge, and RANDALL, Judge.

## OPINION

RANDALL, Judge.

Relator challenges the decision by the unemployment law judge (ULJ) affirming

his earlier decision that relator quit her job without good reason caused by the employer and was disqualified from receiving unemployment benefits. Relator argues that: (a) she did not quit; and (b) if she did, she had good reason to do so based on the physical and verbal abuse by a co-worker, of which her employer was aware. We reverse.

## FACTS

Relator was employed by Reliant Engineering & Manufacturing, Inc. (Reliant Engineering) for approximately eight-and-one-half years as an administrative assistant. She left her place of employment July 21, 2005.

During her employment with Reliant Engineering, relator had a strained relationship with one particular co-worker, Scott Stach (Stach), who worked as a press brake operator in a different area of Reliant Engineering's building. The difficulties with Stach began in late March or early April. of 2004. On that occasion, relator noticed that Stach was swearing and in a bad mood. Relator joked that he did not seem very happy, to which Stach stated that he was not happy because "you are f-ckin' out here you b-tch." There were a number of other employees of Reliant Engineering within the vicinity who heard this and laughed at Stach's comments. Stach attempted to apologize to relator on the following work day. Relator refused to accept the apology, demanding that it be made in front of the individuals who were present when the original comments were made.

Relator alleges that from that point forward, Stach was cold toward her. For instance, Stach would intentionally let doors close after him rather than holding them for her. In one instance, relator was carrying a chair and when Stach refused to hold the door for her, the door closed, hit the chair she was carrying, and pushed it into her chest. The company testified oral warnings were issued to Stach for this and other complaints made by relator regarding his behavior.

At another time, Stach was operating a forklift in the vicinity of relator who was standing in a "safe zone", a demarcated area where no operated vehicle is supposed to travel for the safety of pedestrians and employees of Reliant Engineering. Stach backed the forklift into the safe-zone and came close to relator. Relator was alerted to the danger the forklift to her posed by another individual. Relator again complained to management. Stach was issued a reprimand for improper operation of the forklift and notice of this was placed in his employee file. Relator claimed she was not informed of any disciplinary action taken against Stach.

In the last encounter with Stach, relator was in the company's break-room talking on the telephone. Stach kicked open the door of the break-room; this is a common, but disapproved of, occurrence at Reliant Engineering. This startled relator who screamed aloud. Relator admitted that Stach immediately apologized and stated that he was unaware she was behind the door. The break-room has windows surrounding its doors, but it is unclear whether relator would have been visible from the outside.

Upon exiting the break-room, relator went back to her desk and informed her supervisor, Pam Perales (Perales), that Stach deliberately kicked in the door at her. Relator then returned to Stach's area of Reliant Engineering's building and confronted him personally about kicking the door open. In response to relator asking if Stach thought it was funny to scare her half-to-death Stach responded by stating "get away from me you f-ckin' b-tch if not I'll hit you with this part" (a

"four foot by two foot" paddle-like metal part with sharp edges as described by relator).

Relator asked Perales and Stach's supervisor "what [they were] going to do about [Stach]." Relator told Perales that she couldn't "put up with [this] any longer" and that she was "scared to know what [Stach is] gonna do [ ] next." Finally, relator stated "I'm going to go, I have to leave." After gathering her lunch box and purse, relator left the office. She returned moments later to retrieve another personal item and noticed that Perales and Askren were in the shop area of the building. Unbeknownst to relator, Perales and Askren were at this time discussing the best course of action to take. Reliant Engineering testified that they planned to call an employee-wide meeting that afternoon to discuss the dangers of kicking open doors and planned to speak with Stach personally *again* regarding his behavior toward relator.

Management of Reliant Engineering testified that oral and written warnings had been issued to Stach. There was conflicting testimony regarding whether relator was informed that Stach was disciplined for his actions. The ULJ determined that "Reliant [Engineering] was under no obligation to inform Nichols of the action they had taken and probably would have been violating Stach's rights to confidentiality if they had done so." Reliant Engineering reportedly attempted to contact relator approximately five times the day following these events; receiving a busy signal on her home telephone line, they did not attempt to contact her again. After being unsuccessful in their attempts to contact relator, and having received no contact from relator themselves, Reliant Engineering sent her last pay check with a letter relaying their conclusion that relator had terminated her employment by leaving and not remaining in contact regarding her employment status. This action was consistent with Reliant Engineering policy that stated "absence of one (1) day without notifying the company shall constitute termination without notice."

Relator applied for unemployment benefits. The Department of Employment and Economic Development (DEED) initially found that relator was not disqualified from receiving benefits. Reliant Engineering appealed this decision, and a ULJ reversed DEED's earlier decision. The ULJ noted "improper conduct of a co-worker is only considered a good reason to quit caused by the employer ... if the employer is aware of the conduct and fails to take timely and appropriate action." In the findings of fact, the ULJ found that relator "confronted Stach personally rather than allowing Reliant [Engineering] to deal with the situation" on more than one occasion. This led the ULJ to the conclusion that "The preponderance of the evidence is that Reliant [Engineering] acted appropriately in investigating and acting on Nichols' complaints...." The ULJ determined that relator quit without good reason or exception to statutory disqualification. On relator's petition, the ULJ reconsidered, but affirmed his earlier decision. This certiorari appeal followed.

## ISSUE

Did the unemployment law judge err in determining that verbal abuse and threatened physical harm by a co-worker, of which her employer was aware, did not provide good reason to quit her employment and, thus, disqualifying her from receiving unemployment benefits?

## ANALYSIS

The department's proceedings were conducted under the new procedure. The

former procedure required the unemployment law judge (ULJ) to conduct an evidentiary hearing and reach a decision. Minn.Stat. § 268.105, subd. 1 (2004). The employee, employer, or the senior unemployment review judge (SURJ) (previously the commissioner's representative) on his own motion could obtain de novo review by the SURJ of the ULJ's decision. *Id.*, subd. 2 (2004). Recently, the legislature amended the procedure. 2005 Minn. Laws ch. 112, art. 2 § 34. The ULJ still conducts the evidentiary hearing. Minn.Stat. § 268.105, subd. 1 (Supp.2005). Now, additional departmental review is conducted after a request for reconsideration, which may be filed by the employer, the employee, or the commissioner, and is decided by the same ULJ who conducted the evidentiary hearing. Minn.Stat. § 268.105, subd. 2(a) (Supp.2005).

■ An employee who quits without good reason caused by the employer is disqualified from receiving unemployment benefits. Minn.Stat. § 268.095, subd. 1(1) (Supp.2005). The standard of review for unemployment law judge decisions issued on and after June 25, 2005 has been restated by the Minnesota Legislature at Minn.Stat. § 268.105, sub. 7(d) (Supp. 2005). The legislature stated:

> The Minnesota Court of Appeals may affirm the decision of the unemployment law judge or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion or decision are:
>
> . . . .
>
> 5. unsupported by substantial evidence in view of the entire record; or
>
> 6. arbitrary and capricious

The determination that an employee quit without good reason attributable to the employer is a legal conclusion, but the conclusion must be based on findings that have the requisite evidentiary support. *See Zepp v. Arthur Treacher Fish & Chips, Inc.*, 272 N.W.2d 262, 263 (Minn. 1978) (interpreting predecessor statute and requiring "good cause" attributable to employer).

## A. Whether relator quit her employment with Reliant Engineering

■ In this case, it was determined by the ULJ that relator quit her employment with Reliant Engineering. "Whether an employee has been discharged or voluntarily quit is a question of fact." *Midland Elec., Inc. v. Johnson*, 372 N.W.2d 810, 812 (Minn.App.1985). Factual findings will not be disturbed as long as they are substantially supported by the evidence. Minn. Stat. § 268.105, subd. 7(d)(5). When witness credibility and conflicting evidence are at issue, we defer to the decision-maker's ability to weigh the evidence and make those determinations. *Whitehead v. Moonlight Nursing Care, Inc.* 529 N.W.2d 350, 352 (Minn.App.1995).

Relator left her place of employment after informing her supervisor that she had to leave. After gathering up personal belongings, she left and did not make contact with Reliant Engineering for two days. Reliant Engineering's personnel policy states that: "absence of one (1) day without notifying the company shall constitute termination without notice." After two days of relator missing work without contacting her employer, Reliant Engineering argued that it is reasonable to assume relator had quit.

The ULJ rejected relator's argument that Reliant Engineering had a duty to contact her to ascertain if she had indeed quit. The ULJ also determined that the manner in which relator gathered her belongings and the words she used, specifically regarding not being able "to put up

with [this] any longer" and "[going] to go, [having] to leave," were indicative of an individual who was leaving her employment. Based on this determination, along with relator's failure to contact or return to work for two days, and her apparent lack of intention to return to work unless Reliant Engineering called her, the ULJ held that relator had quit her job. The conclusion that she quit is supported in the record.

## B. Whether relator quit her employment for good reason

■ An employee who quits her employment is disqualified from all unemployment benefits, unless it was based on a good reason caused by the employer. Minn.Stat. § 268.095, subd. 1. "A good reason caused by the employer for quitting is a reason: (1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." Minn.Stat. § 268.095, subd. 3(a) (2004). The legislature sought to insure that employers were given an opportunity to address problems encountered by employees by addressing the definition of good reason, stating: "If an applicant was subjected to adverse working conditions by the employer, the applicant must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." Minn.Stat. § 268.095, subd. 3(c) (Supp.2005). Relator argues that she had a good cause to quit because she was being harassed by a co-worker; she informed her employer of this harassment; the employer failed to take any effective action.

## 1. Good reason directly related to relator's employment and for which employer is responsible

To support a claim for unemployment benefits when a relator has quit her employment, the relator must show a good reason that is directly related to the employment and for which the employer is responsible. Minn.Stat. § 268.095 subd. 3(a)(1). This court has held that harassment may constitute good reason if the employer has notice and fails to take timely and appropriate measures to prevent harassment by a co-worker. *Wetterhahn v. Kimm Co.,* 430 N.W.2d 4, 5–6 (Minn. App.1988) citing *McNabb v. Cub Foods,* 352 N.W.2d 378 (Minn.1984); *Tru–Stone Corp. v. Gutzkow,* 400 N.W.2d 836 (Minn. Ct.App.1987). In *Wetterhahn,* the employer took no affirmative steps within its disciplinary procedures to chastise a harassing employee. 430 N.W.2d 4, 6–7. The Minnesota Supreme Court has held that

> once [a] relator was provided with the expectation of assistance from [her] employer in eliminating alleged fear of harm from a co-worker, the burden was upon [her] to fully apprise the employer of the continuing facts giving rise to that fear. Without this full knowledge, it [is] reasonable for the employer to assume that the problem had been corrected.

*Larson v. Dep't of Economic Security,* 281 N.W.2d 667, 669 (Minn.1979).

Relator claims that the repeated harassment by Stach provided a good reason as required by Minn. Stat § 268.095, subd. 3(a), (c). Relator complained of Stach's behavior from the first time Stach used derogatory obscenities toward her. She continued to complain regarding Stach's failure to hold doors open for her and his overall demeanor towards her. Relator complained to Reliant Engineering regarding the improper maneuvering of the forklift in the safe-zone and voiced concern

over her personal safety in this instance. Finally, relator complained about Stach kicking in the door on her last day at Reliant Engineering. In each instance, relator complained to her manager or the vice-president of the company. Relator's duty to complain further, noted in *Larson*, regarding what she saw as continued harassment was easily satisfied.

For a determination of good reason to quit based on Stach's continued behavior, it must be shown that the company failed to take appropriate affirmative steps (warn, discipline, etc.) to relieve relator of future improper behavior by Stach. Minn. Stat. § 268.095, subd. 3(c); *See also Wetterhahn*, 430 N.W.2d at 6–7. The company claims it issued oral and written warnings to Stach for his improper maneuvering of the forklift and other actions. While it appears that Reliant Engineering "warned" Stach, it is obvious these "discussions" with Stach were woefully inadequate. Stach's improper behavior toward relator continued.

After repeated documented complaints without seeing any *effective* action by the company, it was reasonable for relator not to expect any satisfaction to arise from her complaints. Relator desired, and was entitled to, a speedy and effective reaction by Reliant Engineering to her complaints. This did not occur. Reliant Engineering was derelict in its less-than-definitive steps taken to change Stach's behavior.

### 2. Good reason adverse to relator

The next factor in deciding if relator is qualified for unemployment benefits is whether the good reason was adverse to the relator. Minn.Stat. § 268.095, subd. 3(a)(2). The initial confrontation between relator and Stach was instigated by relator and when an apology was attempted for the inappropriate response, it was denied by relator. Reliant Engineering testified that they spoke with Stach following this incident. Relator was not informed of this conversation and would have had no knowledge of its occurrence but for testimony given by Reliant Engineering management before the ULJ.

Each individual alleged instance of Stach's harassing behavior toward relator does not appear to have been effectively handled by management. The cumulative effect of the incidents was harmful to relator.

Relator informed Reliant Engineering about each of the incidents. At some point, Reliant Engineering had a duty to curb this escalation. While Reliant Engineering testified that in the more severe instances, Stach was spoken to regarding his actions, the record shows the ineffectiveness of whatever discussions Reliant Engineering had with Stach.

Stach's actions with the forklift deserve special attention. Stach drove the forklift into a restricted area set aside for pedestrian use only. A reasonable argument can be made that Stach meant to inflict an intentional scare upon relator. With the forklift, Stach intentionally created an occupational work hazard and could have been fired on the spot for this incident. This incident borders on egregious, as Stach created a work hazard for relator and all other employees within the restricted area.

Relator does not appear to contend that Stach intended to physically injure her when he kicked open the break-room door. Viewed in the context of every other incident between relator and Stach, it is reasonable to assume that Stach wanted to harass relator. Relator immediately complained to the company management and saw no immediate signs that they were interested in taking steps to rein in Stach. Reliant Engineering was investigating the

incident and attempting to decide what actions they would take *this time* when relator left for the last time.

Employees are entitled to feel safe and protected in their workplace. This is a classic case of an employer's failure to correct adverse working conditions which they had notice of as required under Minn. Stat. § 268.095, subd. 3(c). The ULJ's determination that these instances were isolated in nature and were not a form of continuing harassment is unsupported in the record.

**3. An average reasonable worker would have been compelled to quit and become unemployed rather than remaining in the employment of Reliant Engineering**

The final consideration when deciding if relator left her employment for good cause is whether the good reason would drive "an average, reasonable worker to quit and become unemployed rather than remain in the employment." Minn.Stat. § 268.095, subd. 3(a)(3) (2006). The correct standard for determining whether relator's concerns were reasonable is "the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Ferguson v. Department of Employment Servs.*, 311 Minn. 34, 44 n. 5, 247 N.W.2d 895, 900 n. 5 (1976).

The basis for relator's decision to quit her employment with Reliant Engineering centered around relator's complaints regarding Stach's continuing harassing actions, their escalation, and Reliant Engineering's failure to correct this adverse working condition. We conclude that Stach's actions and the failure of Reliant Engineering to effectively address Stach's behavior when given a reasonable opportunity to do so would have compelled an average, reasonable worker, here relator, to quit.

The evidence does not support the ULJ's determination that a reasonable person would have remained employed after being subjected to Stach's continuing inappropriate actions with an employer failing to take the effective steps needed to correct the problem.

## DECISION

Relator had good cause to quit her employment with Reliant Engineering. The record shows that relator kept her employer informed of continuing problems with a co-worker. The record supports relator's claim of intentional and continuing harassment. Reliant Engineering failed to take the necessary steps to correct this problem after being afforded a reasonable opportunity to do so.

Relator quit for good reason caused by the employer. She is entitled to unemployment benefits.

**Reversed.**