*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0287**

Jami Sternquist,
Relator,

vs.

PAL Management, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed December 22, 2014
Reversed
Kirk, Judge**

Department of Employment and Economic Development
File No. 31603265-3

Pamela Abbate-Dattilo, Kristen M. Barlow Rand, Fredrikson & Byron, P.A., Minneapolis, Minnesota (for relator)

Kristin Berger Parker, Stinson Leonard Street LLP, Minneapolis, Minnesota (for respondent PAL Management, Inc.)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Kirk, Judge.

UNPUBLISHED OPINION

**KIRK**, Judge

In this certiorari appeal, relator requests reversal of the decision of an unemployment-law judge (ULJ) that she is ineligible for unemployment benefits because she did not quit her employment due to a good reason caused by the employer. Relator argues that she had good reason to quit because (1) she was paid less due to her gender; (2) she was harassed by a consultant who acted in a supervisory role; and (3) she was uncomfortable managing her regional manager's wife. We reverse.

## FACTS

Relator Jami Sternquist worked for respondent PAL Management, Inc. d/b/a Pawn America, from May 2009 until September 6, 2013. At the end of her employment, Sternquist was the head store manager of the Burnsville Pawn America, which is the company's highest revenue store, and she earned a base salary of $65,000 per year. Sternquist submitted a letter to Pawn America on September 5, 2013, stating that she was quitting her employment because of her concerns about what she perceived to be its discriminatory wage practices and an excessive workload. The next day, Pawn America discharged Sternquist because of its policy of immediately discharging employees who submit notice of their intention to quit their employment.

Following her discharge, Sternquist applied for unemployment benefits. A Minnesota Department of Employment and Economic Development (DEED) administrative clerk determined that she was ineligible for unemployment benefits; Sternquist appealed. A ULJ held an evidentiary hearing, and Sternquist testified that she

2

quit her employment because she believed she was paid significantly less due to her gender, she was harassed by a company consultant, and she was uncomfortable managing her regional manager's wife, who was an employee at the store. The ULJ determined that Sternquist was eligible for unemployment benefits from September 6 through September 14 because she was discharged from employment for reasons other than employment misconduct. But the ULJ determined that Sternquist was ineligible for unemployment benefits beginning September 15 because Sternquist notified Pawn America that she planned to quit her job as of September 19, and she quit for reasons other than a good reason caused by the employer. Sternquist requested reconsideration, and the ULJ affirmed her decision. This certiorari appeal follows.

## D E C I S I O N

When reviewing a ULJ's eligibility decision, this court may affirm, remand for further proceedings, or reverse or modify the decision if the substantial rights of the relator may have been prejudiced because the findings, inferences, conclusion, or decision are affected by an error of law or are unsupported by substantial evidence. 2014 Minn. Laws ch. 271, art. 1, § 1, at 1028-29 (to be codified at Minn. Stat. § 268.105, subd. 7(d) (2014)).

An applicant for unemployment benefits is ineligible for benefits if she quit her employment, unless she quit "because of a good reason caused by the employer." 2014 Minn. Laws ch. 239, art. 2, § 4, at 771-72 (to be codified at Minn. Stat. § 268.095, subd. 1(1) (2014)). To qualify for this exception, the reason must (1) be directly related to the employment and for which the employer is responsible; (2) be adverse to the employee;

3

and (3) compel an average, reasonable employee to quit and become unemployed rather than remaining in employment. Minn. Stat. § 268.095, subd. 3(a) (2012). If the applicant was subjected to adverse working conditions, she "must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." *Id.*, subd. 3(c) (2012).

The reason why an applicant quit is a question of fact. *See Midland Elec., Inc. v. Johnson*, 372 N.W.2d 810, 812 (Minn. App. 1985). This court views the ULJ's factual findings in the light most favorable to the decision, giving deference to the ULJ's credibility determinations, and will not disturb them if the evidence substantially sustains them. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). But whether an applicant had good reason to quit is a question of law, which we review de novo. *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012).

Sternquist argues that she had good reason to quit caused by Pawn America for three reasons: (1) she was harassed by a consultant for Pawn America who acted in a supervisory role; (2) she was paid less because of her gender; and (3) she was uncomfortable managing her regional manager's wife. We first consider Sternquist's argument that she was subjected to both sexual and nonsexual harassment by the consultant. Because different standards apply to each type of harassment, we address each type of harassment separately.

4

## A. Nonsexual harassment.

Nonsexual harassment by another employee may constitute good reason to quit "if the employer has notice and fails to take timely and appropriate measures to prevent [the] harassment." *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 595 (Minn. App. 2006); *see also Tru-Stone Corp. v. Gutzkow*, 400 N.W.2d 836, 838 (Minn. App. 1987) (stating that an employee may establish good cause to quit if he has been subject to harassment while on the job by a coworker and can demonstrate that he gave his employer notice and an opportunity to correct the problem). In *Nichols*, the relator quit her employment after her coworker swore at her at least twice in front of other employees, was "cold" to her, intentionally let doors close after him rather than hold them open for her, backed a forklift dangerously close to where she was standing, and kicked open the door of the breakroom while she was inside talking on the telephone. 720 N.W.2d at 592-93. This court determined that the relator reported each incident of harassment to her employer and her employer failed to take appropriate affirmative steps "to relieve relator of future improper behavior by" the coworker. *Id.* at 596. We concluded that the coworker's actions and the employer's failure "to effectively address [the coworker's] behavior when given a reasonable opportunity to do so would have compelled an average, reasonable worker, here relator, to quit." *Id.* at 597.

Here, the ULJ found that the consultant "often belittled employees, raised his voice, and occasionally swore at them." She also found that on one occasion in May 2013, the consultant "spoke so loudly and so close to Sternquist that his saliva hit her face." The ULJ found that Sternquist complained to her former district manager and the

5

payroll and benefits manager that the consultant belittled her and yelled at her. The ULJ determined that the consultant's nonsexual conduct was "inappropriate and offensive," but that it would not compel an average employee to quit because Sternquist did not work with the consultant on a daily basis, he was sometimes rude and sometimes nice, and he acted similarly with other employees. On reconsideration, the ULJ distinguished the facts of this case from the facts in *Nichols*, stating that the evidence did not show that the consultant wanted to harass Sternquist, the consultant was rude and inappropriate to many employees, and there is no evidence that Sternquist was ever physically threatened or felt unsafe.

The ULJ's findings about the consultant's conduct and Sternquist's report of the conduct are supported by the record. The parties do not dispute that Sternquist reported the conduct and that Pawn America did not investigate Sternquist's complaints. But Sternquist argues that the ULJ erred by concluding that the consultant's behavior would not compel an average, reasonable employee to quit and become unemployed. *See* Minn. Stat. § 268.095, subd. 3(a). "The correct standard for determining whether [the applicant's] concerns were reasonable is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Nichols*, 720 N.W.2d at 597 (quotation omitted).

We conclude that the evidence does not support the ULJ's determination that the consultant's behavior would not compel an average, reasonable person to quit and become unemployed. There was evidence that the consultant screamed at Sternquist so vociferously and so close to her face that saliva was projected onto her. In addition, the

6

record supports the ULJ's finding that the consultant belittled and yelled at Sternquist on other occasions. We disagree with the ULJ that the harassment Sternquist experienced is less serious than the harassment experienced by the relator in *Nichols*. First, there is no requirement that an employee be *physically* harassed. This court has concluded that an employee experienced harassment at work based only on verbal harassment. *See Hanke v. Safari Hair Adventure*, 512 N.W.2d 614, 617 (Minn. App. 1994) (concluding that an employee was harassed by another employee who made homophobic comments to him); *Wetterhahn v. Kimm Co.*, 430 N.W.2d 4, 5, 7 (Minn. App. 1988) (concluding that employee was verbally harassed by a coworker).

Second, although it is uncontested that Sternquist did not work with the consultant on a daily basis, Sternquist testified that the consultant "was in the store consistently" and she could not name all of the dates that he was in the store because there were so many. The record also establishes that the consultant's harassment of Sternquist was ongoing and had not ceased by the time she quit. Sternquist testified that the consultant's behavior continued past June 2013, although she could not provide specific dates when the harassment occurred. She also testified that she had "many" run-ins with the consultant and she complained to her supervisor about him as late as August 2013. Further, this case is distinguishable from *Biegner v. Bloomington Chrysler/Plymouth, Inc.*, 426 N.W.2d 483 (Minn. App. 1988). In that case, this court stated that "[t]he [c]ommissioner . . . found that the [alleged sexual] remarks had ceased approximately three months before Biegner discontinued his employment; therefore, Biegner's separation was not a consequence of the alleged sexual harassment." 426 N.W.2d at 486.

But in the instant case, the ULJ did not find that the consultant's contact with Sternquist or his offensive conduct ever abated, and evidence in the record indicates that the conduct continued well after the May 2013 incident.

Finally, the fact that the consultant's negative behavior similarly affected other employees does not disqualify Sternquist from receiving unemployment benefits. In *Wetterhahn*, this court specifically stated that "[t]he fact that an individual has harassed several employees should not disqualify one of those employees from receiving unemployment compensation benefits, if the employer's response to the situation was inadequate." 430 N.W.2d at 6. Sternquist testified about the consultant's conduct toward her, not toward other employees. And Sternquist's former district manager testified that the consultant's conduct was directed at Sternquist more than other employees. The evidence in the record that other employees were also bothered by the consultant's conduct does not negatively impact Sternquist's eligibility for unemployment benefits.

### B. Sexual harassment.

Sexual harassment may provide an employee with good cause to quit if "the employer was aware, or should have been aware [of the harassment], and the employer failed to take timely and appropriate action." Minn. Stat. § 268.095, subd. 3(f) (2012).

The ULJ found that the consultant told Sternquist that he loved her on two occasions and "occasionally touched Sternquist's and other employees' backs." The ULJ determined that Sternquist quit her employment because of "perceived sexual harassment and aggressive and belittling conduct" by the consultant. But the ULJ found that Sternquist did not report that she was sexually harassed, that the consultant

8

inappropriately touched her, or that the consultant told her he loved her. Because she failed to do so, the ULJ determined that Sternquist did not have a good reason to quit caused by her employer.

The only evidence in the record that Sternquist reported that the consultant touched her back and told her he loved her was her own testimony. She testified that the consultant told her at least twice that he loved her and he thought she was an excellent worker, which made her feel uncomfortable. She also testified that the consultant touched her on her shoulder on multiple occasions and he could be "hot and cold" because he sometimes used overly affectionate words and acted "lovey dovey," and other times he belittled her. Sternquist testified that she reported all of her concerns about the consultant to her district manager, her regional manager, and the human resources director, and the only response she received was that "they do things differently in Australia," which is the consultant's country of origin.

Sternquist's former district manager, the human resources director, and the payroll and benefits manager testified that Sternquist did not complain to them about the alleged sexual harassment. The ULJ found that the testimony of those three witnesses was more credible than Sternquist's testimony, and we defer to the ULJ's credibility determinations. *See Skarhus*, 721 N.W.2d at 344. But we conclude that it would have been reasonable for Sternquist to believe it was futile to complain about the alleged sexual harassment because Pawn America did not investigate any of her complaints about the nonsexual harassment.

9

Accordingly, we conclude that the consultant's nonsexual and sexual harassment, coupled with Pawn America's failure to address Sternquist's complaints when given a reasonable opportunity to do so, would compel an average, reasonable employee to quit and become unemployed. We therefore conclude that the ULJ erred by determining that Sternquist did not have a good reason to quit caused by her employer. As a result of our conclusion, we do not consider Sternquist's additional arguments.

**Reversed.**