*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0775**

Kennedy N. Mogere,
Relator,

vs.

Minnesota Masonic Home Northridge (Corp.),
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed March 23, 2015
Affirmed
Reilly, Judge**

Department of Employment and Economic Development
File No. 31894293-3

Michael D. Gavigan, Wilson Law Group, Minneapolis, Minnesota (for relator)

Minnesota Masonic Home Northridge (Corp.), New Hope, Minnesota (respondent)

Lee B. Nelson, Craig M. Gustafson, Department of Employment and Economic
Development, St. Paul, Minnesota (for respondent Department of Employment and
Economic Development)

Considered and decided by Ross, Presiding Judge; Kirk, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Relator Kennedy Mogere challenges the decision of the unemployment-law judge

(ULJ) that he is ineligible for unemployment benefits, arguing that the ULJ failed to fully

develop the record.  Because the ULJ fully developed the record and sufficient evidence exists to support the decision, we affirm.

## FACTS

Respondent Minnesota Masonic Home Northridge (MMHN) employed Mogere as a registered nurse from January 2011 until November 2013. Mogere worked approximately 32 hours a week, and he regularly picked up extra shifts.  In November 2013, Mogere gave notice of his intent to quit and quit two weeks later. Mogere subsequently applied for unemployment benefits.

In December 2013, respondent Minnesota Department of Employment and Economic Development (DEED) determined that Mogere was ineligible for unemployment benefits.  Mogere appealed this determination, and a ULJ held an evidentiary hearing on January 16, 2014.  Pattie LaRue, the human resources director, Beverly Ransford, the director of nursing, Kimberly Pederson, an administrator, and Elizabeth Nesbitt, a nurse manager, appeared for MMHN at the evidentiary hearing. Mogere appeared pro se and did not present any witnesses.  The witnesses testified to the following events.

On September 26, 2013, Mogere witnessed his supervisor, S.D., acting inappropriately, and he felt obligated to report it.  Mogere sent an e-mail about S.D.'s behavior to Nesbitt, LaRue, Pederson, and Ransford.  The day after Mogere sent the e-mail, Pederson replied, thanked Mogere for the report, and informed him that she was going to address the issue.  Although Ransford had supervisory authority over S.D., both Ransford and S.D. were on vacation when Mogere sent the e-mail.  When Ransford

returned from vacation, she was informed of the situation with S.D. and of the subsequent disciplinary action imposed.

On October 22, Mogere met with Nesbitt regarding an e-mail sent to Nesbitt by a coworker on October 17, 2013. The e-mail alleged that Mogere was completing personal tasks while at work. Prior to meeting with Mogere, Nesbitt spoke with the coworker about the allegations in the e-mail. The coworker conveyed that she was feeling "frustrated" with Mogere's behavior because he was completing personal tasks while at work instead of helping his coworkers.

At this meeting, Mogere received a written warning prohibiting him from picking up additional shifts for two pay periods due to job performance issues. The warning stated that Mogere's work performance was unsatisfactory because he was doing homework, making personal calls, printing personal materials, and selling vegetables while at work. In addition, the warning cited Mogere for missing shifts. During the weekend of October 12-13, 2013, Mogere was scheduled to work two shifts, and he later picked up an additional shift for the weekend. On the morning of October 12, Mogere called in sick with a headache. Mogere also called in sick with headaches for his other two shifts and missed all three of his shifts. Mogere claimed that the information in the coworker's e-mail was not true and testified that Nesbitt refused to investigate the allegations in the e-mail.

On October 22, Mogere sent an e-mail to LaRue, Nesbitt, Ransford, and Pederson describing the meeting with Nesbitt, denying the coworker's allegations, and stating that he felt that he was being retaliated against. On October 25, Ransford, LaRue, and

3

Pederson met with Mogere to discuss the concerns in his October 22 e-mail. During this meeting, Ransford told Mogere that he could transfer to a different unit if he had concerns about his safety or working under Nesbitt's supervision. Mogere declined the transfer. Mogere was also informed that management would conduct further investigation into the coworker's allegations.

On November 11, management informed Mogere that the investigation was over and that the written warning would stand. In the course of the investigation, management interviewed four staff members, and three of the four interviewees confirmed that they saw Mogere perform personal duties while at work. One coworker could not confirm or deny the allegations because she did not work the same shift as Mogere. The interviewed employees signed summaries of their interviews, and these statements were notarized. MMHN submitted these statements as evidence. Mogere testified that MMHN forced some witnesses to sign the statements against their will.

The ULJ suspended the hearing due to time limitations, and rescheduled it for January 21. Mogere stated that he hoped that the employees he mentioned would not be retaliated against. The ULJ informed Mogere that she had no control over that and that if it was "necessary [she] may call those employees--when we have the hearing." The ULJ also asked LaRue if it would be possible to have any of the employees who signed statements available to testify. LaRue told the ULJ that she would ask the employees if they could participate. Mogere then asked if he could have a coworker, P.C., testify. The ULJ agreed to have P.C. as a witness. Mogere also requested to submit two more documents into evidence, which were received.

At the start of the continued hearing, the ULJ asked Mogere if he was having anyone testify as a witness. Mogere responded that his witness was unable to testify during the slotted time but could testify in the future. The ULJ informed Mogere that he had "the right to request that the hearing be rescheduled so that relevant documents or witnesses may be subpoenaed."

The ULJ then asked Mogere about the allegations in the October 17 e-mail. Mogere claimed that he did grow vegetables but that he did not sell them; rather, he gave them away and would leave work only during his breaks. Mogere also denied receiving personal calls at work except for the occasional call from his wife.

Ransford testified that the decision to restrict Mogere's extra shifts was partly due to the allegations that he was completing personal tasks during work hours and partly due to missing three shifts the weekend of October 12. Ransford also testified that Mogere called in sick for consecutive shifts during weekends in April, June, and September.

On January 22, 2014, the ULJ issued a decision, finding that Mogere quit due to disciplinary measures imposed by MMHN. Additionally, the ULJ found that "Mogere quit because he believed that he had been retaliated against and that management was creating a hostile work environment against him by getting his coworkers to make false statements against him." The ULJ explained that she found the testimony of MMHN's witnesses more credible than Mogere's testimony. Finally, the ULJ determined that Mogere did not quit because of a good reason caused by MMHN, and therefore he did not qualify for benefits under the exception provided in Minn. Stat. § 268.095, subd. 1(1)

(2014). Mogere requested reconsideration, and the ULJ issued an order on March 28, 2014, affirming her decision. This certiorari appeal follows.

## D E C I S I O N

Mogere argues that the ULJ erred by determining that he is ineligible for unemployment benefits because he voluntarily quit without a good reason caused by his employer. This court reviews a ULJ's decision denying benefits to determine, among other things, whether the findings, inferences, conclusions, or decision are affected by an error of law, are unsupported by substantial evidence in view of the entire record, or are arbitrary or capricious. Minn. Stat. § 268.105, subd. 7(d) (2014).

## I.

The majority of Mogere's argument on appeal arises from his contention that the ULJ's failure to develop the record rendered her decision erroneous. A ULJ "must exercise control over the hearing procedure in a manner that protects the parties' rights to a fair hearing." Minn. R. 3310.2921 (2013). A hearing is generally considered fair if both parties are afforded the opportunity to give statements, examine and cross-examine witnesses, and offer and object to exhibits. *See Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529-30 (Minn. App. 2007). A ULJ should assist unrepresented parties in the presentation of evidence and ensure that all relevant facts are clearly and fully developed. Minn. R. 3310.2921.

First, Mogere claims that the notarized statements of the MMHN employees are impermissible evidence under Minn. Stat. § 268.105, subd. 1(b) (2012), because they were not signed under penalty of perjury. The legislature has delegated discretion to

6

DEED to develop evidentiary rules, and the rules "need not conform to common law or statutory rules of evidence and other technical rules of procedure." Minn. Stat. § 268.105, subd. 1(b). Under the rules DEED has adopted, Minnesota Rule 3310.2922 (2013), allows a ULJ to consider "any evidence that possesses probative value, including hearsay, if it is the type of evidence on which reasonable, prudent persons are accustomed to rely."

Here, the notarized statements possess probative value and are the type of evidence on which a reasonable person relies. Mogere did not object to the admission of the statements. Accordingly, the notarized statements are permissible evidence, and the ULJ did not err in considering these statements when making her decision.

Mogere next claims that the ULJ erred when she failed to allow Mogere an opportunity to confront the witnesses who signed the statements. Because Mogere did not make a request to subpoena witnesses, his argument, in essence, challenges the ULJ's decision to not sua sponte subpoena witnesses. *See* Minn. R. 3310.2914, subp. 1 (Supp. 2014) ("The unemployment law judge may issue a subpoena even if a party has not requested one."). On appeal, this court applies an abuse-of-discretion standard to a relator's contention that the ULJ erred by denying a subpoena request. *Icenhower v. Total Auto. Inc.*, 845 N.W.2d 849, 853-54 (Minn. App. 2014), *review denied* (Minn. July 15, 2014).

In arguing that his inability to cross-examine statement witnesses constituted a denial of the right to present material evidence, Mogere relies on *Thompson v. Cnty. of Hennepin*, 660 N.W.2d 157 (Minn. App. 2003), and *Ntamere v. Decisionone Corp.*, 673

7

N.W.2d 179 (Minn. App. 2003). These cases are not applicable because the relator in both cases requested that subpoenas be issued to secure the testimony of witnesses, and the subpoenas were not complied with. *See Ntamere*, 673 N.W.2d at 180; *Thompson*, 660 N.W.2d at 159. Mogere, however, did not request that the ULJ issue subpoenas, nor did he ask the ULJ to continue the hearing so that he could call witnesses.

Even if Mogere had made a request to subpoena witnesses, their testimony would have been immaterial as additional witness testimony was not necessary because the ULJ sufficiently developed the record. The ULJ found that "[i]t is not likely that three employees would make false allegations against Mogere, or that management would coerce three employees to make such false statements. It is much more likely that the employees' complaints were true, and that Mogere did use company time for personal tasks." The ULJ afforded each party an opportunity to cross-examine witnesses and offer additional facts at the end of testimony.[1] The ULJ also assisted Mogere in questioning the MMHN witnesses and developing his arguments by framing his inquiries and instructing witnesses to answer some questions despite their apparently tangential relevance. The ULJ asked Mogere to explain why he believed he was the victim of retaliation. Both parties gave closing statements, during which Mogere alleged for the first time that he was discriminated against because of his race. The ULJ then questioned Mogere about his race allegations.

---

[1] The ULJ also received ten exhibits into evidence during the evidentiary hearing, including two discipline warnings, an attendance log, the coworker's e-mail, Mogere's e-mails, notes from the meetings with Mogere, notarized statements from four employees, Mogere's resignation letter, Mogere's e-mail reporting S.D.'s misconduct, and the e-mails thanking Mogere for his report.

8

In sum, the ULJ fully developed the record by asking Mogere questions about the circumstances leading to his employment separation and assisted him in cross-examining MMHN's witnesses. The ULJ did not abuse her discretion when she did not sua sponte issue subpoenas because additional witness testimony would have been immaterial.

**II.**

Mogere argues that he quit for a good reason caused by MMHN. A quit from employment disqualifies an applicant from receiving unemployment benefits unless one of ten statutory exceptions applies. Minn. Stat. § 268.095, subd. 1 (2014). One exception is when the applicant quit for "a good reason caused by the employer." *Id.*, subd. 1(1). A good reason caused by the employer is one "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a) (2014). This analysis must be applied to the specific facts of each case. *Id*., subd. 3(b) (2014).

This court views the "ULJ's factual findings in the light most favorable to the decision, giving deference to the credibility determinations made by the ULJ. In doing so, we will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (citations omitted). The reason why an individual quits employment is a fact question for the ULJ to determine. *See Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986) (reviewing determination of the reason the employee quit as a factual question).

9

Mogere contends that the record "does not contain sufficient or substantial evidence to support" the ULJ's findings as to why Mogere quit. The ULJ determined that Mogere quit because he "may have disagreed with the severity of the discipline issued to him on October 22." The ULJ also concluded that Mogere's claim that his discipline was given in retaliation was "unfounded," and that his "insistence that his coworkers were coerced to write false statements against him is also not supported by the evidence." Instead, the ULJ found that Mogere's warning was issued for attendance issues and Mogere's completion of personal tasks during work.

Mogere challenges the use of his attendance record as a basis for his discipline. The record reveals that Mogere's attendance issues were partially responsible for his discipline:

> ULJ: Was the decision to take Mr. Mogere off the extra shifts made because of his calling in that weekend or was it because of the other information that was provided to you that he was doing personal chores during work hours.
> RANSFORD: Both, both Your Honor.

Mogere also confirmed that the discipline was partly imposed for calling in on a weekend that he was scheduled to work three shifts. Moreover, four months prior to the imposition of discipline, Mogere took part in a formal discussion concerning his "excessive absenteeism" and was warned that failure to meet future expectations would result in further disciplinary action.

Next, Mogere asserts that his discipline was based in part on retaliatory or discriminatory motives. The crux of this argument attacks the ULJ's credibility determinations. "Credibility determinations are the exclusive province of the ULJ and

10

will not be disturbed on appeal." *Skarhus*, 721 N.W.2d at 345. The ULJ found MMHN's witness testimony to be more credible than Mogere's testimony, and the witness testimony "was corroborated by notarized statements from several employees." *See* Minn. Stat. § 268.105, subd. 1a(a) (2014) ("When the credibility of a witness testifying in a hearing has a significant effect on the outcome of a decision, the unemployment law judge must set out the reason for crediting or discrediting that testimony.").

Mogere claims that the lack of prior complaints against him supports a finding that the discipline was retaliatory and discriminatory. The ULJ, however, found that MMHN took appropriate measures to address Mogere's concerns and that Mogere "unreasonably" believed that a conspiracy against him existed. Moreover, MMHN investigated the allegations made by Mogere and concluded that they were "unsubstantiated." The record supports the ULJ's conclusion that Mogere's discipline was not imposed for retaliatory or discriminatory reasons.

Whether an employee's reason for quitting qualifies as a good reason to quit caused by the employer is a legal question, which this court reviews de novo. *Rootes v. Wal-Mart Assocs., Inc.*, 669 N.W.2d 416, 418 (Minn. App. 2003). Substantial evidence must support the legal conclusion that an employee quits for a good reason. *See Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 594 (Minn. App. 2006). Generally, the circumstances causing an employee to quit with good cause "must be real, not imaginary, substantial not trifling, and reasonable, not whimsical." *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 884 (Minn. App. 2012).

11

Mogere does not challenge the ULJ's legal conclusion that the discipline imposed is not a reason that would cause an average, reasonable worker to quit. Rather, he primarily challenges the reasons underlying the discipline as inadequate and not reasonable. The ULJ concluded that the discipline imposed on Mogere—a two-pay-period ban on picking up extra shifts—would not cause "an average, reasonable worker in those circumstances to choose the uncertainties of unemployment over a steady paycheck." We agree.

"The correct standard for determining whether relator's concerns were reasonable is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Nichols*, 720 N.W.2d at 597 (quotation omitted). Although Mogere claimed he was being retaliated against, the ULJ found that Mogere's retaliation allegations were unfounded. We conclude that an average, reasonable worker would not quit his job when confronted with the extra-shift restriction that was imposed in this case.

In sum, the reasons credited by the ULJ as Mogere's reasons for quitting do not fulfill the statutory definition of a good reason to quit caused by the employer. Therefore, the ULJ did not err in finding Mogere ineligible for unemployment benefits.

**Affirmed.**

12