*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0679**

Crystal Longtin,
Relator,

vs.

EEG, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed January 11, 2016
Affirmed
Rodenberg, Judge**

Department of Employment and Economic Development
File No. 33088364-3

Crystal Longtin, Wyoming, Minnesota (pro se relator)

Lee B. Nelson, St. Paul, Minnesota (for respondent department)

EEG, Inc., Pottsville, Pennsylvania (respondent)

Considered and decided by Reilly, Presiding Judge; Schellhas, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

In this certiorari appeal, relator Crystal Longtin challenges the determination of an unemployment-law judge (ULJ) that she is ineligible for unemployment benefits. She

argues that she quit her employment due to a good reason caused by the employer. We affirm.

## FACTS

Relator was a cosmetology educator at respondent EEG, Inc., d/b/a Empire Beauty School (Empire), from August 11, 2014 to November 11, 2014. Relator quit her employment on November 12, 2014, and maintains that she did so due to a good reason caused by Empire.

On November 25, 2014, relator applied for unemployment benefits. On December 10, 2014, the Minnesota Department of Employment and Economic Development (DEED) determined that relator was eligible for unemployment benefits because she quit her employment for a good reason caused by Empire. Empire appealed and a ULJ conducted a hearing on February 3, 2015 by way of a telephone conference call.

The evidence at the hearing was that relator was "shadowing" a senior instructor in the classroom during her employment. Throughout that time, relator observed "fighting, bullying, [and] harassing" involving the adult students. She reported this to her supervisor, Kathyrn Akenson. Relator was concerned primarily with the harassing behavior of one of the students, Student A. Relator observed Student A engage in acts of physical intimidation; bullying concerning sexual orientation, religion, and race; and foul language directed at relator. Student A is "very assertive" and has been involved in multiple "verbal altercations" with other students.

2

On November 11, 2014, relator responded to Student A bullying another student, and Student A "proceeded to yell and scream and swear at [relator] and told [relator that Student A] was going to beat [relator's] ass." Relator testified that this increased her anxiety and stress. She also testified, however, that despite this particular threat of physical violence, she had not personally seen any physical assaults or violence at Empire. Relator noted that "[t]here were a lot of really close calls of, of fights in the classroom but we deescalated them."

When Student A threatened relator with physical violence, relator immediately went to Akenson and told her that Student A was "doing it again." But relator concedes that she did not tell Akenson that Student A had threatened her with physical violence. In response to that incident, Akenson sent Student A home for the day and suspended her for November 12. She told relator that she had done so. During a lengthy conversation, relator told Akenson that she did not feel supported by Akenson. Relator was emotional during the meeting, and Akenson described relator as "an emotional wreck," "distraught," and "at her wits end." As a possible solution for relator's stress, Akenson proposed having relator switch to teaching in the night program because she thought that would "be a better fit" for relator.

Akenson testified that, when relator reported concerns regarding student behavior, Akenson would talk to the students involved, including Student A. With Student A in particular, Akenson was "working with [her] almost every day with her language and her professionalism." Akenson also testified that she "sen[t] [Student A] home on three different occasions, November 6, November 10 and [Akenson] just suspended her on

3

November 12 because of [Student A's] escalating behavior." Relator wanted Akenson to "terminate [Student A]" but Akenson did not believe that terminating her was appropriate based on the information she had. Akenson testified that, if she had known about the threat of physical violence toward relator, she "would have suspended [Student A] for three days and then [Akenson] would have interviewed students, teachers." She described a similar situation that occurred during her employment at another school, and she explained that she had suspended and ultimately terminated that student. In response to a question concerning whether relator gave Akenson enough time to address Student A's behavior before quitting, Akenson said, "Absolutely not."

The ULJ issued a decision finding that relator quit her employment with Empire and is ineligible for unemployment benefits. Relator requested reconsideration of the ULJ's decision, and the ULJ issued an order in which he "determined that the finding[s] of fact and decision dated Friday, February 6, 2015, are correct, but that the reasons for the decision did not correctly print and are reissued here in their entirety." The ULJ determined that "[b]ecause [relator] did not report that she was physically threatened, Empire had no opportunity to correct the adverse condition" and, therefore, "the physical threat cannot be considered a good reason caused by Empire for quitting." Finding that Empire had taken reasonable measures to address instances of bullying at the school, the ULJ determined that "the discrepancy between how Empire was handling bullying and what [relator] thought should be taking place, was not so adverse as to compel an average, reasonable worker to quit." This certiorari appeal followed.

4

**D E C I S I O N**

When reviewing a ULJ's eligibility decision, we may affirm, remand for further proceedings, or reverse or modify the decision if the substantial rights of the relator have been prejudiced because the findings, inferences, conclusion, or decision are affected by an error of law or are unsupported by substantial evidence. Minn. Stat. § 268.105, subd. 7(d)(4)-(5) (Supp. 2015). Factual findings are viewed in the light most favorable to the ULJ's decision, and we will not disturb them if they are substantially supported by the evidence in the record. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006).

An applicant for unemployment benefits is ineligible for benefits if she quit her employment, unless (among other things) she quit "because of a good reason caused by the employer." Minn. Stat. § 268.095, subd. 1(1) (2014). To qualify for this exception, the reason must be (1) directly related to the employment and for which the employer is responsible; (2) adverse to the employee; and (3) one that would compel an average, reasonable employee to quit and become unemployed rather than remaining in employment. Minn. Stat. § 268.095, subd. 3(a) (2014). If the applicant was subjected to adverse working conditions, she must have complained to her employer and "give[n] the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." *Id.*, subd. 3(c) (2014). Whether an employee had a good reason to quit caused by the employer is a question of law, which is reviewed de novo. *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012). But the reason an employee quit is a question of fact. *See Beyer*

5

*v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986) (reviewing a determination of the reason an employee quit as a fact question).  The conclusion that an employee did not have a good reason to quit must be based on factual findings supported by substantial evidence.  *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 594 (Minn. App. 2006).

Relator argues that she quit working at Empire because of a good reason caused by the employer.  She argues that she was subjected to a hostile work environment that included harassment and bullying toward her and other students.  The ULJ found as a fact that relator reported "witnessing bullying on several occasions," but that "[r]easonable measures were being taken to correct instances of bullying at Empire."  The ULJ found as a fact that "[s]tudents were suspended, students were required to attend mediation session[s], and students were required to meet with Akenson personally."  The ULJ also found as a fact that relator did not report the physical threat to Akenson or anyone else with Empire.  The ULJ therefore concluded that Empire had no opportunity to correct that adverse condition, which "cannot be considered good reason caused by Empire for quitting."  Instead, the ULJ proceeded to analyze the good-reason exception by considering the facts concerning the verbal harassment and bullying.

The record substantially supports the ULJ's finding that relator never reported the physical threat to Akenson or anyone else at Empire.  Although relator's testimony reveals troubling student behavior which undoubtedly made her work uncomfortable, Empire never had an opportunity, much less a reasonable one, to correct the adverse working condition concerning the physical threat to relator.  *See* Minn. Stat. § 268.095,

6

subd. 3(c); *cf. Nichols*, 720 N.W.2d at 592-93 (reversing ULJ's ineligibility determination where employee reported escalating threats of physical violence and verbal abuse, and employer did not take reasonable measures to correct those conditions). Because Akenson was unaware of the physical threat, the ULJ correctly concluded that "the physical threat cannot be considered a good reason caused by Empire for quitting."

Relator seems to concede that the record supports the ULJ's factual findings. She nevertheless argues that, even without the physical threat, the working conditions at Empire, as described in the ULJ's findings of facts, were sufficiently hostile and adverse so as to make "completing [her] job virtually impossible." She argues that Akenson "had ample time . . . to correct and stop behaviors of bullying, harassment, and verbal abuse, and that [Akenson] was the only person at the campus that had the power to do so and failed." Despite relator's understandable frustrations, it is clear from the record that Akenson took reasonable steps to address the bullying behavior at Empire. The record supports the ULJ's finding that Akenson sent Student A home on November 11 and suspended her for November 12. The record also establishes that Akenson suspended Student A on November 6 and 10, and had expelled other students for physical threats.

The ULJ properly concluded that "the discrepancy between how Empire was handling bullying and what [relator] thought should be taking place, was not so adverse as to compel an average, reasonable worker to quit." Of the incidents that relator reported to Akenson, the record shows that Akenson was taking steps toward correcting those behaviors. Relator's complaints concerning Akenson's disciplinary decisions are fairly characterized as irreconcilable differences. "Irreconcilable differences with an

7

employer do not constitute 'good cause' to quit, nor does mere dissatisfaction with working conditions." *Ryks v. Nieuwsma Livestock Equip.*, 410 N.W.2d 380, 382 (Minn. App. 1987).

Despite relator's disagreement with Akenson's disciplinary decisions, the record supports the ULJ's finding that Akenson was taking steps to correct the complained-of behavior of Student A. Having no knowledge of the threat of physical violence, Akenson could not have acted to correct that condition. The steps to correct the adverse conditions were reasonable, given what the ULJ found Akenson to have known. The residual disagreement between relator and Akenson concerning disciplinary decisions does not constitute a good reason for quitting.

**Affirmed.**