*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1517**

Lee Xiong,
Relator,

vs.

Water Gremlin Co. (Corp.),
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed May 23, 2016
Affirmed
Rodenberg, Judge**

Department of Employment and Economic Development
File No. 33525405-3

Lee Xiong, St. Paul, Minnesota (pro se relator)

Water Gremlin Co. (Corp.), White Bear Lake, Minnesota (respondent)

Lee B. Nelson, Timothy C. Schepers, St. Paul, Minnesota (for respondent department)

Considered and decided by Peterson, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

# U N P U B L I S H E D   O P I N I O N

**RODENBERG**, Judge

In this certiorari appeal, relator Lee Xiong challenges the determination of an unemployment-law judge (ULJ) that he is ineligible for unemployment benefits. He

argues that he quit his employment due to a good reason caused by the employer. We affirm.

## FACTS

Relator was a maintenance technician at the Water Gremlin Company (the company) from March 31, 2014 to March 26, 2015. In October 2014, relator was given a warning for unsatisfactory attendance. In November 2014, relator was warned for failing to follow instructions and procedures when performing maintenance on a machine, causing damage to the machine.

At some point in 2014, relator complained to the maintenance manager concerning relator's supervisor's demeanor. The supervisor was admonished by the maintenance manager.

In January 2015, the maintenance manager spoke with relator about several performance issues, including not using his time wisely, not properly accounting for his time at work, and failing to follow procedures. During this conversation, relator complained about his supervisor using a loud tone of voice when interacting with him and telling relator that he could only use the bathroom in case of emergencies. The maintenance manager confirmed that relator should only use the bathroom for emergencies unless he was on break.

On February 24, 2015, relator's supervisor made a racist comment to relator while confronting him about again failing to follow proper procedures. After receiving an email from the supervisor indicating that he "had had some problems with [relator]," the maintenance manager interviewed relator, the supervisor, a second-shift supervisor, and

2

an operator who had been in the area. Relator complained that the supervisor had yelled at him and treated him badly, but did not then mention the racist comment. The operator stated that he observed an argument but could not hear what was said over the factory noise and his earplugs. The supervisor admitted that he had confronted relator about his repeated failure to use a certain diagnostic program.

On March 3, 2015, the maintenance manager again warned relator about not following proper procedures, insubordination, and rudeness during the February 24 incident. The following day, relator submitted to the human-resources manager a handwritten response to this warning. He detailed the incident and, for the first time, disclosed the supervisor's February 24 racist comment. The human-resources manager interviewed relator, the supervisors, and two operators who relator believed had witnessed the incident. The operators denied hearing the racist comment, and the supervisor denied making it. The human-resources manager determined that the supervisor had likely raised his voice in frustration, and he told the supervisor that he needed to take a "kinder, gentler approach" to working with others. The supervisor was not otherwise disciplined. The human-resources manager also investigated relator's allegation concerning another racist comment the supervisor made to another operator, who confirmed that the supervisor had made the comment but that the operator "hadn't thought to tell [the human resources manager]." Relator, unhappy with the investigations, asked the company's vice president if he could conduct his own investigation. The vice president denied his request.

On March 26, 2015, relator received a negative performance evaluation indicating that he "needed improvement" in the safety and quality-of-work categories. Relator was not disciplined but was denied a pay increase because of the warnings and the overall negative evaluation. Relator quit his employment that same day, maintaining that he did so because he received warnings in retaliation for reporting the supervisor's racist comment.

Relator applied for unemployment benefits. The Minnesota Department of Employment and Economic Development (DEED) determined that relator was ineligible for unemployment benefits because he had not demonstrated a good reason caused by the company for quitting his employment. Relator appealed, and a ULJ conducted a telephone hearing.

The ULJ issued a decision finding that relator quit his employment with the company, rendering him ineligible for unemployment benefits. Relator requested reconsideration, and the ULJ issued an order in August 2015 determining "that the findings of fact and reasons for decisions issued on June 3, 2015 are not factually correct and should be modified but that the decision is legally correct." The ULJ determined on reconsideration that the supervisor's racist comment amounted to an adverse working condition. But the ULJ also found, based on relator's testimony, that the adverse condition had been alleviated, that relator had not had any negative interactions with the supervisor after that date, and that the supervisor had made no further similar comments. The ULJ also determined that "because [relator] had received performance-related warnings prior to February 24, it is unlikely that [the company] issued [relator] the

4

March 3, 2015 warning to retaliate against him. It is also unlikely that, in an at-will employment relationship, an employer would fabricate warnings [concerning] employees solely to discharge them." The ULJ found that "the record does not support that . . . the second shift supervisor closely monitored [relator] in an effort to discharge him. The most reasonable explanation is that [relator] was not following policies and procedures." Therefore, the ULJ determined that relator "was not entitled to a pay raise and he was not given a pay raise because of work performance issues. An average, reasonable employee would not quit and become unemployed in those circumstances." This certiorari appeal followed.

## D E C I S I O N

When reviewing a ULJ's eligibility decision, we may affirm, remand for further proceedings, or reverse or modify the decision if the substantial rights of the relator have been prejudiced because the findings, inferences, conclusion, or decision are affected by an error of law or are unsupported by substantial evidence. Minn. Stat. § 268.105, subd. 7(d)(4)-(5) (Supp. 2015). Factual findings are viewed in the light most favorable to the ULJ's decision, and we will not disturb them if they are substantially supported by the evidence in the record. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006).

An employee who quits employment cannot collect unemployment benefits unless, as relevant here, the employee quits for a good reason caused by the employer. Minn. Stat. § 268.095, subd. 1(1) (2014). An employee quits when, at the time his or her employment ended, it was the employee's decision to end the employment. *Id.*, subd.

5

2(a) (2014). It is undisputed that relator made the decision to quit. To qualify for the good-reason exception, the reason must be: "(1) directly related to the employment and for which the employer is responsible"; (2) adverse to the employee; and (3) one "that would compel an average, reasonable [employee] to quit and become unemployed rather than remaining in the employment." Minn. Stat. § 268.095, subd. 3(a). The "reasonable worker" standard is objective and considers what an average person would do. *See Ferguson v. Dep't of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976). However, before quitting is considered to be for good reason, an employee is required to "give the employer a reasonable opportunity to correct the adverse working conditions." Minn. Stat. § 268.095, subd. 3(c) (2014). Racial discrimination constitutes good cause to quit. *Marz v. Dep't of Emp't Servs.*, 256 N.W.2d 287, 289 (Minn. 1977).

Whether an employee had a good reason to quit caused by the employer is a question of law reviewed de novo. *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012). But the reason an employee quit is a question of fact. *See Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986) (reviewing a determination of the reason an employee quit as a fact question). The conclusion that an employee did not have a good reason to quit must be based on factual findings supported by substantial evidence. *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 594 (Minn. App. 2006).

Relator argues that he had a good reason to quit caused by the employer because he was subjected to racial harassment and unfair treatment from his supervisor, the company had failed to take action against the supervisor, and the warning he received and

6

his poor performance review were in retaliation for complaining about the racist comment. The ULJ found as a fact that relator was subject to an adverse working condition on February 24, 2015 because of the supervisor's racist comment. The ULJ also found as a fact that the adverse condition had been alleviated. There were no more such comments, and relator had not had any negative interactions with the supervisor after that date. The ULJ found relator's claim that the second-shift supervisor had closely monitored him in an effort to harass him unpersuasive, stating that "[t]he most reasonable explanation [the supervisor monitored relator] is that [relator] was not following policies and procedures." The ULJ therefore concluded that relator had voluntarily terminated his employment because he was upset over his poor performance evaluation, a response to the evaluation that an average, reasonable person would not have had.

Relator seems to concede that the record supports the ULJ's factual findings. He nevertheless argues that the working conditions at the company were sufficiently adverse to make continuing employment there "uncomfortable." The record substantially supports the ULJ's finding that relator did not quit for good reason caused by the employer. Although the supervisor's racist comment undoubtedly made relator's work uncomfortable, the company took reasonable measures to correct the supervisor's behaviors, as indicated by relator's testimony that he had not had any other negative encounters with the supervisor after the incident was investigated. Relator's complaints concerning the management's disciplinary decisions are fairly characterized as irreconcilable differences. "Irreconcilable differences with an employer do not constitute

'good cause' to quit, nor does mere dissatisfaction with working conditions." *Ryks v. Nieuwsma Livestock Equip.*, 410 N.W.2d 380, 382 (Minn. App. 1987).

The ULJ's determination that relator's poor performance review was due to his multiple past warnings is also supported by the record. Relator had been warned twice before for unsatisfactory attendance and failing to follow safety protocols. The maintenance manager had also spoken with relator about excessive non-work-related computer use, using his time wisely, appropriate use of break times, ongoing failure to follow diagnostic procedures, and unauthorized use of equipment. Relator had been warned that he needed to ask questions if he was unsure how to complete a task and that he needed to record his performance in a daily maintenance log. Relator's performance review indicating that he "need[ed] improvement" in the safety and quality-of-work categories reflects these previous warnings. Despite relator's performance review, the maintenance manager testified that he had no plan to terminate relator's employment. The performance review showing below-average performance meant that no pay increase would be forthcoming, but relator had no promise of a pay increase.

Relator claims on appeal that the supervisor made other racist comments and had twice before hit operators on the head. He also argues that the human-resources manager had threatened to fire the supervisor, but he was not fired. Relator never made these allegations before the ULJ. An issue that was not raised before the ULJ is not properly before this court on review. *Peterson v. Ne. Bank-Minneapolis*, 805 N.W.2d 878, 883 (Minn. App. 2011). Moreover, even if these allegations were properly before us, there is no record evidence that relator reported them to management during his employment.

8

*See* Minn. Stat. § 268.095, subd. 3(c); *cf. Nichols*, 720 N.W.2d at 592-93 (reversing ULJ's ineligibility determination where employee reported escalating threats of physical violence and verbal abuse, and employer did not take reasonable measures to correct those conditions). Because there is no evidence that the company was aware of any other verbal or physical threats, those conditions cannot be considered good cause for relator quitting.

In sum, the record supports the ULJ's factual findings and conclusions of law on reconsideration. The ULJ's determination that relator is ineligible for unemployment benefits is not erroneous because relator made the decision to quit his employment and he does not satisfy a statutory exception to ineligibility.

**Affirmed.**