*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0939**

Janella Scott,
Relator,

vs.

The Phoenix Residence, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed April 15, 2024
Affirmed
Ede, Judge**

Department of Employment and Economic Development
File No. 49242355-2

Peter B. Knapp, Nicholas E. Gobran (certified student attorney), Mitchell Hamline Law Clinic, St. Paul, Minnesota (for relator)

Keri A. Phillips, Katrina Gulstad, Minnesota Department of Employment and Economic Security, St. Paul, Minnesota (for respondent department)

The Phoenix Residence, Inc., St. Paul, Minnesota (respondent employer)

Considered and decided by Reyes, Presiding Judge; Larson, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

Relator appeals from an unemployment-law judge's (ULJ) decision that she is ineligible for unemployment benefits because she quit her employment without good

reason. Relator seeks reversal of the ULJ's decision, arguing that respondent employer's failure to act in response to her reports of the suspected abuse of a vulnerable resident constituted a good reason for quitting. We affirm.

**FACTS**

Relator Janella Scott was employed as a part-time support professional with respondent The Phoenix Residence, Inc. (Phoenix) until she submitted her two-week notice to Phoenix staff on December 1, 2022, which Phoenix accepted effective immediately.

Scott applied for unemployment benefits. Respondent Minnesota Department of Employment and Economic Development (DEED) issued an initial determination of ineligibility, stating that Scott quit "because of alleged harassment, abusive behavior, or a hostile work environment." DEED concluded that, because "[t]he evidence [did] not show that [Scott] complained to the employer about the harassment, abusive behavior, or hostile work environment[,]" Scott did not have a good reason to quit caused by her employer. Based on DEED's determination, Scott was ineligible to receive unemployment benefits per Minnesota Statutes section 268.095 (2022).

Scott administratively appealed. A ULJ held an evidentiary hearing on Scott's appeal in February 2023. Along with Scott's testimony, the ULJ heard testimony from A.B., Phoenix's vice president of community services, and N.B., Phoenix's director of human resources. The ULJ later issued findings of fact and a decision, determining that Scott was ineligible for unemployment benefits because she quit her employment and no exception applied.

2

Except where otherwise specified, the ULJ found the following facts. As summarized below, these facts are undisputed on appeal.

In 2014, Scott began employment with Phoenix. In 2020, Phoenix transferred Scott to a new location to address Scott's concerns about an unprofessional work environment. At the new location, Scott reported to D.W., a manager. Scott thought that D.W. was unprofessional because D.W. would micromanage her.

Scott testified that, as a support professional, she was expected to report and record "on the daily" when she found bruising or when she thought there were injuries to her clients. Scott believed that D.W. was responsible for bruising on one of the residents at Phoenix. Beginning in September 2021, Scott reported the resident's bruises four times "in company records, but believed her reports were not addressed." In the records of her reports, Scott did not identify any individual as causing bruising to the resident.[1] According to Scott's testimony, by recording her reports with a "high" notification level, she alerted the appropriate management staff. A.B., however, testified that, if Scott felt her supervisor was the culprit of potential abuse, the correct reporting procedure "in line with . . . [Scott's] training" was to notify another superior within the organization by telephone call.

---

[1] Although Scott testified that the records she created were about her suspicions that someone was abusing the resident, the records themselves are unclear on that point. For example, in a record Scott created in March 2022, Scott stated that there was a bruise on the resident that was "of great concern to [her], for [it] was not the first time." But Scott also reported that staff said the resident fell in the shower, thereby providing an explanation for the bruise that was not abuse. On the other hand, in the last record Scott created on November 12, 2022, Scott implied abuse without expressly saying so, although she did not identify a suspected abuser. More specifically, the November 12 record notes that, after Scott submitted reports about the resident's bruises, "the bruising would stop for a short time."

Scott's last written report, which she recorded on November 12, 2022, noted that Scott had not received a response to her concerns about the resident's bruises. Scott believed that D.W. had inappropriately modified the records Scott had created. Aside from her written reports, Scott had contacted a program manager in 2021 and formally reported the suspected abuse, but she ultimately felt that her complaints were not addressed. Scott testified that she did not specifically tell the program manager that she thought D.W. was responsible for the resident's bruising and that the program manager "found no fault."

A.B. testified that, on November 30, 2022, he received a message from one of Scott's coworkers, which stated that Scott had concerns about D.W. potentially harming a resident, as well as other general concerns about D.W. In addition, A.B. testified that he spoke with Scott on the phone that same date, that they scheduled a meeting for the next day to discuss the information A.B. had received from Scott's coworker, and that A.B. sent Scott his list of questions for her review before their meeting. A.B., N.B., and Scott met for about two hours on December 1. This meeting was 19 days after Scott's final written report and one day after A.B. received the message from Scott's coworker relaying Scott's concerns that D.W. was potentially harming a resident. At the meeting, Phoenix did not issue Scott any reprimands or warnings. Scott thought that being called into the meeting was unfair to her and constituted harassment.

A.B. further testified that, during the December 1 meeting, Scott stated her belief that D.W. had caused bruising to the resident, but Scott could not provide a reason why she held that belief. In his testimony, A.B. said that, if a resolution with D.W. was impossible, management could move Scott to another location. Scott testified that she wanted Phoenix

4

to move D.W. away from the resident, but Scott did not receive a direct answer to her proposal. Scott expected to receive a specific plan of action or solution at the meeting, but that did not occur to Scott's satisfaction. Because Phoenix did not provide Scott with a specific plan of action, and because Scott "felt anxious and was concerned about her hypertension and overall health," Scott submitted her two-week notice during the meeting. Phoenix accepted Scott's notice of quitting effective immediately because A.B. and N.B. did not think that Scott's continued work during her notice period would be productive. If Scott had not submitted her two-week notice, Phoenix would have allowed Scott to continue her employment.

The ULJ concluded that Scott did not have a good reason to quit caused by Phoenix because "[t]he work environment even as described by Scott would not cause an average reasonable person to quit and become unemployed rather than remaining in the employment." The ULJ also reasoned that "[a]n average reasonable person might begin to seek another job under these circumstances, but he or she would not quit and become unemployed before finding other work."

Following the ULJ's findings of fact and decision that no exception applied to Scott's quit from employment, Scott filed a request for reconsideration. The ULJ denied Scott's request and affirmed the ineligibility decision.

Scott appeals.

**DECISION**

Scott challenges the ULJ's determination that she is ineligible for unemployment benefits because she quit her employment without good reason caused by Phoenix.

Generally, an employee who "quit[s] employment is ineligible for unemployment benefits." Minn. Stat. § 268.095, subd. 1. But a person who "quit the employment because of a good reason caused by the employer" may be eligible for benefits.[2] *Id.*, subd. 1(1).

> A good reason caused by the employer for quitting is a reason: (1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment.

*Id.*, subd. 3(a)(1)-(3). When determining whether an average worker would quit their employment, the correct standard is "'the standard of reasonableness as applied to the average man or woman, and not to the supersensitive.'" *Nichols v. Reliant Engineering & Mfg., Inc.*, 720 N.W.2d 590, 597 (Minn. App. 2006) (quoting *Ferguson v. Dep't of Emp. Servs.*, 247 N.W.2d 895, 900 n.5 (Minn. 1976)).

The analysis of factors set forth in Minnesota Statutes section 268.095, subdivision 3(a), "must be applied to the specific facts of each case." Minn. Stat. § 268.095,

---

[2] Scott has not argued, either on appeal or before the ULJ, that any of the other exceptions to ineligibility for unemployment benefits based on quitting apply. *See* Minn. Stat. § 268.095, subd. 1. Because no prejudicial error relating to the applicability of any other quit exception is obvious on mere inspection, our analysis focuses on whether the ULJ erred in deciding that Scott did not have a good reason to quit caused by Phoenix. *See id.*, subd. 1(1); *see also State v. Andersen*, 871 N.W.2d 910, 915 (Minn. 2015) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." (quotation omitted)).

subd. 3(b). The statute also provides that "[i]f an applicant was subjected to adverse working conditions by the employer, the applicant must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be a good reason caused by the employer for quitting." *Id.*, subd. 3(c). "The issue of whether an employee had good reason to quit is a question of law reviewed de novo." *Peppi v. Phyllis Wheatley Cmty. Ctr.*, 614 N.W.2d 750, 752 (Minn. App. 2000).

Assuming without deciding that Scott had a reason for quitting (1) that is directly related to her employment and for which Phoenix is responsible, and (2) that is adverse to Scott, *see* Minn. Stat. § 268.095, subd. 3(a)(1)-(2), we consider whether Scott's reason for quitting would compel an average, reasonable worker to quit and become unemployed rather than remain in the employment, *see id.*, subd. 3(a)(3). Based on our de novo review of the specific facts here, we conclude that Scott's reasons for quitting would not, and that Scott did not give Phoenix a reasonable opportunity to correct the allegedly adverse working conditions after the December 1 meeting.

Scott quit her employment with Phoenix because Phoenix did not provide her with a specific plan of action for addressing her abuse suspicions, and because Scott had anxiety and health concerns. Although Scott's training required that she notify another superior within the organization by telephone call if she felt her supervisor was the culprit of potential abuse, she did not do so. Instead, Scott made an oral report to a program manager in 2021 that did not identify D.W. as responsible for the resident's bruising, and the program manager "found no fault." In addition, between September 2021 and November

7

12, 2022, Scott created written records of the resident's bruises that likewise did not specify any individual as having harmed the resident.

On November 30, 2022, after A.B. received a message from one of Scott's coworkers about Scott's concerns about D.W. potentially harming a resident, A.B. contacted Scott and scheduled a meeting to discuss the matter the very next day. At oral argument, DEED conceded that the 19-day period between Scott's November 12 record and the December 1 meeting was "ample time" for Phoenix to prepare to discuss Scott's reported concerns. But the December 1 meeting was also the first time that Scott directly disclosed to a superior, in line with her training, Scott's belief that D.W.—or any specific person, for that matter—was abusing the resident.

After this formal report, Scott needed to give Phoenix a reasonable opportunity to correct these allegedly adverse working conditions before the conditions could be a good reason for Scott to quit, caused by Phoenix. *See* Minn. Stat. § 268.095, subd. 3(c). Scott, however, did not allow Phoenix a reasonable opportunity to implement any potential solutions. Rather than accept a move to another location or await a direct answer to her proposal that Phoenix move D.W. away from the resident, Scott submitted her two-week notice at the December 1 meeting, the same meeting in which Scott made her first direct disclosure to a superior that she believed D.W. had bruised the resident.

We conclude that an average, reasonable person concerned for a resident's safety would have followed the correct reporting procedure to disclose suspicions of abuse by a particular perpetrator—especially a manager—to another superior within the organization, in the first instance. And an average, reasonable person would have continued the

8

employment to ensure that the employer remedy such concerns. Even if we did not so conclude, Scott at the very least needed to afford Phoenix a reasonable opportunity to correct the conditions that she was complaining about, once she directly informed A.B. and N.B. that she believed D.W. was abusing the resident. *See* Minn. Stat. § 268.095, subd. 3(c). Because Scott failed to do so, we conclude that these specific facts do not amount to a good reason to quit caused by Phoenix. *See id.*

**Affirmed.**